**DANCO, INC. and Benjamin Guiliani, Plaintiffs, Appellees/Cross–Appellants,**

v.

**WAL–MART STORES, INC., Defendant, Appellant/Cross–Appellee.**

**Nos. 98–2101, 98–2269.**

United States Court of Appeals, First Circuit.

Heard April 6, 1999.

Decided May 12, 1999.

Mark V. Franco with whom Michael R. Bosse and Thompson & Bowie were on brief for defendant.

Harold J. Friedman with whom Karen Frink Wolf and Friedman Babcock & Gaythwaite were on brief for plaintiffs.

Before TORRUELLA, Chief Judge, BOUDIN and STAHL, Circuit Judges.

BOUDIN, Circuit Judge.

In the district court, Danco, Inc., and its owner Benjamin Guiliani, brought suit against Wal–Mart, which is a major discount retailer. On a claim for racial discrimination under 42 U.S.C. § 1981, the jury awarded the plaintiffs $650,000, based on a hostile work environment theory; the judge reduced the award to $300,000. Wal–Mart appeals from this judgment; the plaintiffs cross-appeal from the district court's dismissal prior to the jury's verdict of plaintiffs' claim for punitive damages.

Benjamin Guiliani—a Mexican–American—started his company, Danco, in 1988 to engage in the business of maintaining parking lots (cleaning, striping, etc.). He incorporated the company in 1994. He continued to be the sole shareholder, but employed his son, Daniel, and a small number of other employees from time to time. His principal contracts during the time in question were with various Wal–Mart stores.

On September 15, 1994, Guiliani signed a contract, on behalf of Danco, agreeing to perform parking lot maintenance for the Wal–Mart store in Augusta, Maine. The agreement called for Danco to clear litter from the lot three times each week, and to clear sand from the lot (using a vacuum-type sweeper) once a week. The sweeping provision was included in the contract because the Augusta Wal–Mart had a special site approval permit, from the Maine Department of Environmental Protection, requiring the lot to be swept of sand each week to prevent the sand from being washed into a nearby brook.

According to Guiliani's trial testimony, he felt unwelcome at Wal–Mart soon after he signed the contract to maintain its lot. Early in October 1994, there were two men in a truck in the parking lot when he arrived to start working. They asked him what he was doing in the lot, and if "Big Bob" knew he was there. When the men told Big Bob (later identified as Bob Amadei, the maintenance supervisor) that Guiliani was in the lot, Big Bob told Guiliani to leave, saying that he did not know of anyone who had been hired to work on the lot. At trial, Amadei denied that he had ever had words with Guiliani.

Also early in October 1994, the words "White Supremacy" were spray-painted on the Wal–Mart parking lot, near to the spot where Guiliani and his son usually unloaded their equipment. Guiliani testified that he saw Amadei walking toward the store shortly before Guiliani drove over to the spot where the words were painted. His son Daniel testified that he had seen Ama-

dei at the spot with a can of spray paint, leaning over as if he were spraying the paint. Amadei denied that he had anything to do with the graffiti.

Guiliani offered to cover over the spray paint in the parking lot, but Curtis Scheffe, the manager of the Augusta store and the person to whom Guiliani reported, said that he would take care of it and would investigate to find out who had done it. Although Scheffe testified at trial that he thought he had had an employee cover the graffiti with paint shortly after the incident, all other testimony indicated that the words remained on the lot for over a month. Guiliani claimed that he told Scheffe that he believed Amadei was the culprit, but Scheffe took no action against Amadei. Scheffe said he did investigate and concluded that no one was willing to say that they knew anything about the incident, although two of Wal-Mart's night shift workers testified that he had not spoken personally to them about it.

A second incident occurred on October 14, 1994. Guiliani testified that Hamlin, another night shift employee, said to him, "I don't like your kind." When Guiliani asked what he meant, Hamlin said "Puerto Ricans." Guiliani said that he was Mexican-American. Then, Guiliani said, Hamlin pushed him and threatened to rip his head off. Guiliani returned to his vehicle, where his younger son (Benjamin, Jr., age 8) was waiting, and called the police a short time later. Hamlin testified that he had made only a harmless jest not involving race, that Guiliani started the quarrel, and that there was no pushing.

The final incident took place in November 1994. Guiliani testified that Hamlin yelled a racial slur at him from a passing vehicle. His son Benjamin, Jr., also testified that he heard the slur. Guiliani said that he was shaken by the incident, and again called the police. Hamlin again denied the incident. Scheffe testified that he again investigated, but did not discipline

Hamlin because he could prove neither Guiliani's nor Hamlin's story.

In January 1995, Scheffe left the Augusta Wal-Mart, and James Helterbrake replaced Scheffe as the manager. Guiliani testified that when he told Helterbrake in February about the earlier incidents, Helterbrake became angry about the police's having been called. Later in the month, Helterbrake gave Danco notice that the company's services were to be terminated, assertedly because Helterbrake was unhappy with Danco's work. After further discussions, a new contract was signed on February 21, 1995, calling for Danco to sweep twice a week. However, Helterbrake remained unhappy with the sweeping and terminated that contract at the end of March.

At trial, Charles Kellogg of the Maine Department of Environmental Protection testified that he had been displeased about the amount of sand left on the lot. He said that he spoke to Scheffe and Helterbrake a number of times about the sand on the lot, as both confirmed. In February 1995, Kellogg sent a letter to Wal-Mart stating that the sand removal had not been adequate. Kellogg also testified that he had spoken to Guiliani about the state of the lot, but Guiliani denied this. At the time Guiliani was terminated, Kellogg said that he was considering steps against Wal-Mart to enforce the permit condition.

In March 1997, approximately two years after the termination of Danco's contract, Guiliani and Danco sued Wal-Mart. The complaint alleged a violation of civil rights under 42 U.S.C. § 1981, denial of public accommodations in violation of 5 Maine 1 R.S.A. § 4551 et seq., breach of written contract, breach of oral contract, unjust enrichment, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, and requests for compensatory and punitive damages. Wal-Mart moved for summary judgment on all counts. The district judge then dismissed three of the state claims and set

the others for trial.[1]

The case was tried to a jury in late April 1997. At the close of the plaintiffs' case, Wal–Mart moved for a directed verdict on all remaining claims, but the district court granted the motion only as to the request for punitive damages. As part of its motion, Wal–Mart argued unsuccessfully that the civil rights claim under section 1981 should be treated as comprising only a wrongful termination and not a hostile work environment theory. The court also refused to reconsider its pre-trial decision not to allow Wal–Mart to impeach Guiliani's credibility based on an incident that occurred some 15 years before.

Before instructing the jury, the judge told counsel that he would tell the jury to treat the two plaintiffs as one person— Benjamin Guiliani—for the purpose of their deliberations. Neither side objected to this instruction which the judge then gave. The judge's instructions as to section 1981 included separate instructions on the discriminatory termination theory and the hostile work environment theory. For the hostile work environment theory, the judge gave instructions that would be standard for a Title VII hostile work environment claim, but omitted any references to "employee" (because of Danco's independent contractor status). Throughout, the court rejected Wal–Mart's argument that independent contractors had no right to make such claims based on a hostile work environment theory.

By special verdict, the jury found for the plaintiffs on the hostile work environment theory under section 1981, the claim for negligent infliction of emotional distress, and one of several contract theories.[2] The jury found for Wal–Mart on the discriminatory termination theory under section 1981 and on the remaining contract theo-

ries. The jury awarded the plaintiffs $650,000 on the hostile work environment claim and—despite the liability finding— zero damages on the claim for negligent infliction of emotional distress. The judge granted a remittitur to which the plaintiffs assented, reducing the jury's award of $650,000 to $300,000. *Cf. Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1396 (6th Cir.1990), *cert. denied*, 498 U.S. 1082, 111 S.Ct. 952, 112 L.Ed.2d 1041 (1991).

Wal–Mart now appeals on two different grounds from the district court's refusal to award Wal–Mart judgment as a matter of law: first, that an independent contractor cannot bring suit based on a hostile work environment under section 1981, and second, that the evidence presented at trial was insufficient to show a hostile work environment. Wal–Mart also says that the district court erred in refusing to admit proffered evidence to impeach Guiliani's credibility. Plaintiffs cross-appeal challenging the district court's decision to withdraw their punitive damages request from the jury.

■ We review *de novo* the district court's denial of judgment as a matter of law, viewing the evidence in the light most favorable to the nonmovant. *See Correa v. Hospital San Francisco*, 69 F.3d 1184, 1191 (1st Cir.1995), *cert. denied*, 517 U.S. 1136, 116 S.Ct. 1423, 134 L.Ed.2d 547 (1996). The most important issues raised by Wal–Mart's motion involve the construction of 42 U.S.C. § 1981, which *inter alia* gives all persons equal rights to "make and enforce contracts" free from racial discrimination. The initial question is whether this provision gives an independent contractor a racial discrimination claim based on the hostile work environment theory that would be available to an

---

1. The claims dismissed on summary judgment were public accommodations, negligence, and intentional infliction of emotional distress. The dismissal has not been appealed. The claims set for trial were the section 1981 claim, the contract claims, and the claim for negligent infliction of emotional distress.

2. The contract theory accepted by the jury involved a contract to clean a parking lot at a different Wal–Mart–owned store and resulted in an award of $4,400. No appeal has been taken as to this award.

employee under an ordinary employment contract.

The Supreme Court first recognized the hostile work environment theory under Title VII, 42 U.S.C. § 2000e–2, which prohibits discrimination in employment on racial or gender grounds (among others). In *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Court found that sexual misconduct that had "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment" violated Title VII because, in the words of the statute, it amounted to sex-based discrimination in "terms, conditions, or privileges of employment." Under Title VII, the same theory also applies to racial harassment of employees that has the same effects. *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 463 (1st Cir.1996).

Title VII is unavailable to plaintiffs here because they were never Wal–Mart employees. For this reason, the complaint relied upon section 1981, which is part of the original Civil Rights Act of 1866. Unlike 42 U.S.C. § 1983, which broadly protects federal rights from impairment under color of state law, section 1981 protects only certain specified rights, including the right to make and enforce contracts, and it protects them only against racial discrimination. But since 1968, section 1981 has been applied to private acts of discrimination as well as official acts.[3]

In addition, the Supreme Court held in 1975 that the statute covers employment contracts, thereby protecting against racial discrimination in the employment relationship. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

However, until 1991, section 1981 was read literally as applying only to the *making* and *enforcement* of contracts, and "enforcement" was read narrowly to include only enforcement by legal process. *Patterson v. McLean Credit Union,* 491 U.S. 164, 177–78, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). *Patterson* held that no hostile work environment claim could be brought under section 1981 because the environment might discriminate in the carrying out of a contract—infringing its terms, conditions and privileges—but did not impede the "making" or "enforcement" of contracts. 491 U.S. at 178, 109 S.Ct. 2363.

■ In 1991, Congress amended section 1981 specifically to overrule the *Patterson* decision. *See* H.R.Rep. No. 102–40(I), at 141 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 670. New language defines the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). This language tracks language of Title VII prohibiting discrimination with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). Thus, hostile work environment claims may now be pursued by employees under both Title VII and section 1981. *See Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1008 n. 17 (11th Cir.1997) (collecting cases).

■ If an employee may sue under section 1981 on a hostile work environment theory, can an independent contractor also do so? On the face of the statute, nothing

---

**3.** The Supreme Court ruled in *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 413, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), that 42 U.S.C. § 1982, a directly analogous statute, prohibited acts of private discrimination, and the courts have applied this ruling to section 1981. *See, e.g., Waters v. Wisconsin Steel Works of Int'l Harvester Co.,* 427 F.2d 476, 481 (7th Cir.), *cert. denied,* 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); *Scott v. Young,* 421 F.2d 143, 145 (4th Cir.), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970). The constitutional basis is the Thirteenth Amendment. *See Jones,* 392 U.S. at 413, 88 S.Ct. 2186.

forbids such a claim. Section 1981 does not limit itself, or even refer, to employment contracts but embraces all contracts and therefore includes contracts by which a corporate independent contractor like Danco provides service to another corporation like Wal–Mart. *See T & S Serv. Assocs., Inc. v. Crenson,* 666 F.2d 722, 725 (1st Cir.1981). One could say that avoiding a hostile work environment is an implicit contractual benefit or term that exists for employees but not independent contractors, yet nothing in the statute's language supports such a limitation.

Wal–Mart makes two arguments against allowing a hostile work environment claim by an independent contractor. The first is that the 1991 amendment was intended to secure such claims for *employees,* as the legislative history makes clear. *See* H.R.Rep. No. 102–40(I), at 141, *reprinted in* 1991 U.S.C.C.A.N. 549, 670. But references to employees appear because most cases involve employees rather than independent contractors. There is nothing in the legislative history to suggest that Congress had any objection to providing similar benefits to independent contractors, and the *language* it used in its amendment applies as readily to the one as to the other. In fact, H.R.Rep. No. 102–40(I), at 92, *reprinted in* 1991 U.S.C.C.A.N. 549, 630, states that "[t]he Committee intends this provision to bar all race discrimination in contractual relations."

Alternatively, Wal–Mart paints a vivid picture of liability run amok if a company is made responsible not only to protect its own employees against racial harassment in the workplace but also to protect all of the contractors with whom the company may deal. These problems may be considerable, but it is fair to point out that the hostile work environment theory is likely to be useful only to those independent contractors who work on site, and (as we

shall see) the claims of such contractors are more limited than Wal–Mart supposes. Beyond that, the problems if any are for Congress to fix.

■ Nevertheless, in the present case Danco has a potential claim under section 1981, but Guiliani does not. The same statutory language that gives a claim to Danco, as an independent contractor with Wal–Mart, precludes such a claim by Guiliani unless he also had a contract with Wal–Mart. It appears, not surprisingly, that the contract in question was between Wal–Mart and Danco.[4] Nothing in section 1981 provides a personal claim, so far as its language is concerned, to one who is merely *affiliated*—as an owner or employee—with a contracting party that is discriminated against by the company that made the contract.

■ A corporation ordinarily carries out its activities through its employees, and work-site racial discrimination against Danco's employees could amount to racial discrimination against Danco causing damage to the company. But the employee cannot collect damages on his own behalf. *Cf. Gersman v. Group Health Ass'n, Inc.,* 931 F.2d 1565, 1573 (D.C.Cir.1991), *vacated on other grounds,* 502 U.S. 1068, 112 S.Ct. 960, 117 L.Ed.2d 127, *but original opinion adopted on remand,* 975 F.2d 886 (D.C.Cir.1992), *cert. denied,* 511 U.S. 1068, 114 S.Ct. 1642, 128 L.Ed.2d 363 (1994); *Perez v. Abbott Lab.,* 1995 WL 86716, at *6 (N.D.Ill. Feb. 27, 1995). And the suffering of Guiliani, however real, is not automatically damage to Danco.

Thus, if the issue had been raised, Wal–Mart would likely have been entitled to an instruction that Guiliani had no claim of any kind under section 1981 because he had no contract. Further, Guiliani offered evidence that he had suffered emotional harm but there does not appear to be evidence that Danco, as distinct from Gui-

---

**4.** Although the complaint said that the Wal–Mart contract was with "plaintiffs," Wal–Mart's statement of undisputed facts corrected this assertion, citing to the contract itself, and plaintiffs' counter-statement did not disagree. An examination of the contract itself makes clear that the two parties to the contract were Wal–Mart and Danco.

liani, was measurably damaged by the racial incidents. So Wal–Mart might also have been entitled to a directed verdict on Danco's hostile work environment theory for lack of evidence of damages to Danco. However, so far as we can tell, neither point was argued to the district court.

■ It is true that Wal–Mart argued in the district court that neither Danco nor Guiliani had a claim under section 1981. But the reasons given were quite different. It is well settled that to preserve a claim for review on appeal, the party claiming error must have supplied the right ground for the request. The basis for this requirement is obvious: the judge must largely rely upon the parties to research and raise issues, and giving the judge the wrong reason for a request is usually equivalent to giving the judge no reason at all. *Havinga v. Crowley Towing & Transp. Co.*, 24 F.3d 1480, 1483 n. 5 (1st Cir.1994); *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 810 (1st Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988).

■ This brings us to the plain error doctrine. *Hammond v. T.J. Little & .Co., Inc.*, 82 F.3d 1166, 1172 (1st Cir.1996). The requirements for plain error, set forth by the Supreme Court in *United States v. Olano*, 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), are that there be error, that it be plain, that it affect substantial rights and that the error threaten "miscarriage of justice." *Olano* was a criminal case but in this circuit, the same requirements are commonly imposed in civil cases, and even more stringently. As we said recently in *Beatty v. Michael Bus. Machs. Corp.*, 172 F.3d 117, 121 (1st

Cir.1999) (citations and internal quotation marks omitted):

> The plain error exception should be applied sparingly and only in exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice. The exception should be confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings.

■ In this case, letting any claim by Guiliani under section 1981 go to the jury was an error; it was arguably at least "plain" error; and it affected substantial rights in the sense that no damages to Danco were proved from the harassment. But there are several reasons which, taken in combination, persuade us that there is no miscarriage of justice or any other reason sufficient to exercise our discretion to notice the error or errors in the case before us. *See Olano*, 507 U.S. at 736, 113 S.Ct. 1770; *Beatty*, 172 F.3d 117, 121.

The first reason is that Wal–Mart, as well as the plaintiffs, affirmatively consented to the district court's instructions to treat Guiliani and Danco interchangeably. The reasons may have been tactical or may have resulted from a genuine misunderstanding of the law that governs whether and when a small incorporated business can be treated interchangeably with its owner and operator.[5] If the former, this would be a waiver not subject to plain error; but even if the latter is true, it is at least a consideration, in exercising our discretion, that the legal issue was specifically discussed and counsel affirmatively consented to treating the plaintiffs as one.

Second, it counts heavily against finding plain error that the party on the other side would be unfairly prejudiced. Here, it

---

5. There is little indication from the facts in this record that Guiliani would be subject to suit under a "piercing the veil" theory if Danco committed a tort, *Theberge v. Darbro, Inc.*, 684 A.2d 1298, 1300–01 (Me.1996); Henn & Alexander, *Laws of Corporations* § 147, at 352–53 (3d ed.1983); but there is

even less basis in law for assuming that, if the corporation were a sham, Guiliani could take advantage of a sham he had created to assert Danco's rights *as a plaintiff, see La-Belle v. Crepeau*, 593 A.2d 653, 655 (Me. 1991).

seems unlikely that Danco itself could have established monetary damages of any size from the racial incidents; but it is not impossible that some showing could have been attempted *if* the plaintiffs had known that Guiliani's right to recover for the emotional effects on him was legally disputed on the basis we are now considering. Whether and how much damage Danco might have proven is speculative; but that is exactly why we cannot say for sure that there was no prejudice from the failure to raise the objection in timely fashion.

Third, the jury would likely have awarded substantial damages, and quite possibly the same $650,000, on the negligent infliction claim if Guiliani's section 1981 claim had been stricken. As the case was tried, the same racial harassment underlay both claims. Whatever the jury was told in the instructions, the jury's decision to award zero damages for negligent infliction, after a finding that Wal–Mart was liable on that claim, was probably due to the jury's belief that the award on the section 1981 claim already covered the same injury. In sum, we do not find that this error "calls into question the fairness, integrity, or public reputation of judicial proceedings." *Beatty*, 172 F.3d 117, 121.

It remains to consider, on Wal–Mart's appeal, its claim that it was entitled to judgment as a matter of law under section 1981 because the evidence was not sufficient for a reasonable jury to find that a hostile work environment existed. The barrier to reversal on this ground is high, given the jury's superior ability to gauge the witnesses and draw inferences in favor of one side or the other on this highly factual issue. *See Costos v. Coconut Island Corp.*, 137 F.3d 46, 48 (1st Cir.1998). Viewing the evidence in the light most favorable to the plaintiffs, this may have been a thin case but not so thin as to preclude a reasonable jury from finding a hostile work environment.

To make out a hostile work environment claim, the plaintiff must show not only a contractual relationship but also two further elements: (1) that the plaintiff was exposed to comments, jokes, or acts of a racial nature by the defendant's employees; and (2) that the conduct had the purpose or effect of interfering with the plaintiff's work performance or created an intimidating, hostile or offensive working environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In addition, the defendant will ordinarily only be liable for harassment by low-level employees if management-level employees knew or should have known about it. *See Burrell v. Star Nursery, Inc.*, 170 F.3d 951, 955 (9th Cir. 1999).

In this case, the plaintiffs alleged three race-related incidents. While a plaintiff must show "more than a few isolated incidents of racial enmity," *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986), there is no "absolute numerical standard" by which to determine whether harassment has created a hostile environment, *Vance v. Southern Bell Telephone & Telegraph Co.*, 863 F.2d 1503, 1511 (11th Cir.1989). In the Supreme Court's words:

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris*, 510 U.S. at 23, 114 S.Ct. 367.

In this case, all of the incidents involved utterances but one also involved a low level of physical violence (or so the jury could have found) and one, it could be argued, effectively lasted for months because Guiliani had to face the graffiti on the parking lot every time he worked on the lot. Guiliani also alleged that he altered his schedule so that he would work on the Wal-

Mart lot in daylight because of the harassment, an action that suggests some amount of interference with his work because of the harassment. Although much of the evidence was contested, the jury is assumed to have believed the plaintiffs' version. *See Correa,* 69 F.3d at 1191.

Even on this premise, these allegations do seem rather tame compared to many reported cases involving racially hostile working environments. *Cf. West v. Philadelphia Elec. Co.,* 45 F.3d 744, 749–52 (3d Cir.1995); *Snell,* 782 F.2d at 1098–1100 (2d Cir.1986). However, they are not so trivial that we would countermand a jury's decision that they constituted a violation of section 1981. Of course, no evidence exists that Danco itself suffered specific monetary damage; but (as already noted), that may be because Wal–Mart's legal attack on the section 1981 claim was insufficiently precise to alert plaintiffs to any need to make such a separate showing.

■ Wal–Mart's final ground for appeal is that the district judge should have allowed Guiliani to be impeached based on a 15–year old incident. While Guiliani's credibility was certainly important, the probative value of the incident was minimal, and a danger of prejudice existed. Exclusion of the evidence was not an abuse of the district court's substantial discretion to allow or exclude such impeaching evidence. *See Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1340 (1st Cir.1988).

■ Turning to the plaintiffs' cross-appeal, their claim is that the district court erred in deciding that the evidence did not permit an award of punitive damages and in withdrawing that issue from the jury. The standard for punitive damages in civil rights cases, whether under Title VII or sections 1981–83, is drawn from *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), where the Court said that the plaintiff must show that the defendant acted with "evil motive or intent" or with "reckless or callous indifference" to the plaintiff's federally protected rights.[6]

However, section 1983 cases, like *Smith v. Wade* itself, often involve only the wrongdoing individual, whereas cases like this one and cases under Title VII often involve a company from whom the plaintiff seeks compensation and punitive damages for the acts of low-level employees. Company liability for compensatory damages is fairly easy to establish although not automatic, *e.g., Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); but the rule for punitive damages has been complicated because the precedents often do not distinguish between the wrongdoing employee and the employer against whom the punitive damage claim is directed.

■ Such distinctions may not be pertinent where the discriminatory conduct is a matter of company policy or is engaged in by management officials whose own intent may automatically be imputed to the company. *Cf. Dichner v. Liberty Travel,* 141 F.3d 24, 28–29 (1st Cir.1998); *Rowlett,* 832 F.2d at 201–03. However, where, as here, we are concerned only with isolated acts of harassment by ordinary employees—Amadei had limited supervisory authority but not over Guiliani—it follows that punitive damages should be afforded only where the management itself "by evil motive or intent" engaged in racial discrimination or behaved in a manner that showed "reckless or callous indifference" to such discrimination. *Smith,* 461 U.S. at 56, 103 S.Ct. 1625.

This view has been taken in well-reasoned decisions in the Fourth and Tenth Circuits.[7] More important, it accords with the Supreme Court's reminder in *Smith* that punitive damages are to deter serious-

**6.** *Smith* was a section 1983 case, but the same standard has been applied by this court and others under section 1981, *e.g., Rowlett v. Anheuser–Busch,* 832 F.2d 194, 205 (1st Cir. 1987), and Congress in 1991 wrote similar language into Title VII to govern punitive damages. 42 U.S.C. § 1981a(b)(1).

**7.** *See Harris v. L & L Wings, Inc.,* 132 F.3d 978, 982–84 (4th Cir.1997); *Fitzgerald v. Mountain States Tel. & Tel. Co.,* 68 F.3d 1257,

ly wrongful conduct by the defendant and not just to provide another layer of compensation. *See Hernandez–Tirado v. Artau,* 874 F.2d 866, 869 (1st Cir.1989) (Breyer, J.). It is consistent with this view to require that before a company is held liable for *punitive* damages for acts of harassment by low-level employees, there be some culpability beyond mere negligence at the management level.

In this instance, the district judge rightly concluded that no such malicious or evil intent or reckless indifference could be attributed to Wal–Mart, whatever one might say about Amadei and Hamlin. Even if Scheffe could be described as management for this purpose—which we will assume *arguendo* but do not decide—there is no indication that he was motivated by racist attitudes or that he paid no attention to the complaints of harassment by Guiliani. On the contrary, the record shows that he investigated two of the three incidents but found no definitive evidence as to what had happened; and on the remaining incident Scheffe testified that he had undertaken an investigation and explained why it bore no fruit, and there was no conclusive proof to the contrary.

Certainly a jury might have found that Scheffe was careless. He apparently did not question all of the 14 night shift workers about the spray paint episode, and he failed to see that the spray paint was promptly removed, even though he testified that he thought he had given instructions that it be done and that this had occurred. But Guiliani himself testified that Scheffe was not racist, and Scheffe's missteps hardly reveal the evil intent or reckless disregard of civil rights necessary to support punitive damages.

*Affirmed.*

1262–64 (10th Cir.1995). The Fifth Circuit originally adopted a more plaintiff-friendly standard in *Deffenbaugh–Williams v. Wal-Mart Stores, Inc.,* 156 F.3d 581 (5th Cir.1998).

However, the opinion has been vacated and the case set for rehearing. 169 F.3d 215 (5th Cir.1999).