Dubuche v. Emery Worldwide Airlines    CV-00-556-B    10/09/02

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Karl V. Dubuche**

    **v.**                                    Civil No. 00-556-B
                                                Opinion No. 2002 DNH 181
**Emery Worldwide Airlines, Inc.**


MEMORANDUM AND ORDER

Karl V. Dubuche brings suit against his former employer, Emery Worldwide Airlines, Inc. ("Emery"), alleging racial discrimination based upon claims of a hostile work environment, failure to promote, and retaliation. See 42 U.S.C. § 2000e-2(a), 3(a) (1994) (Title VII); 42 U.S.C. § 1981 (1994). Emery moves for summary judgment, contending that Dubuche has failed to establish a prima facie case of discrimination or, alternatively, has failed to demonstrate that Emery's actions were a pretext for discrimination. Emery also moves to strike portions of certain affidavits submitted by Dubuche. For the reasons set forth below, I grant Emery's motion for summary judgment as it pertains to Dubuche's claims of a hostile work environment and discriminatory failure to promote, and deny Emery's motion as it pertains to Dubuche's claim of retaliation. I also deny Emery's

motions to strike.[1]

## I.  BACKGROUND[2]

Emery operated a mail processing facility in Nashua, New
Hampshire under the terms of a contract with the United States
Postal Service.  Karl Dubuche, who states that he is a
"Carribean-born black," worked as a mail sorter at Emery
beginning in May 1998.  When he applied for the job, Dubuche told
Andrew Teebagy, the supervisor who interviewed him, that he may
be late for work because he depended upon others for
transportation.  Teebagy told him that this would not be an
issue, as long as Dubuche worked hard.  Soon after he started at
Emery, Dubuche again asked Teebagy whether his lateness would be
a problem.  Teebagy reiterated what he had previously told

---

[1]  Because they contain hearsay, are insufficiently
specific, or are argumentative, conclusory, or speculative, Emery
asks the court to strike portions of the affidavits of Dubuche,
Jason Kendrick, and Anthony Hanneman.  I give the affidavits what
credence is due, in light of the rules pertaining to the content
of affidavits.  See Fed. R. Civ. P. 56(e).  On that basis,
defendant's motions to strike the affidavits are denied.

[2]  I construe the evidence in the light most favorable to
Dubuche, the non-moving party, and draw all reasonable inferences
in his favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st
Cir. 2001) (explaining the operation of Fed. R. Civ. P. 56).

Dubuche. Dubuche frequently worked overtime and was a hard worker. There is, however, no dispute that he was often late for work.

During the fall of 1998, Dubuche began applying for various promotions. He applied for one of two ATAG operator positions.[3] Both positions, however, were awarded to other black employees who, according to Emery, were more qualified than Dubuche.[4] Dubuche also applied for one of four seasonal quality assurance positions, but again the jobs were awarded to employees who apparently had better credentials than Dubuche.

Dubuche eventually was offered a promotion to ramp clerk. However, Dubuche did not accept the offer immediately because he wanted to speak with his wife before accepting the job. Ultimately, Dubuche was not promoted. According to Emery, it rescinded the job offer because Dubuche did not respond in a

_____

[3] In Emery's hierarchy, mail sorters were at the bottom. Positions such as "ramp clerk" and "ATAG operator" were coveted because they paid more and involved far less, if any, manual labor. Typically, mail sorters were responsible for lifting and hauling mail bags and packages.

[4] Dubuche contends that he was the only person whose parents were both black. Regardless of Dubuche's description of the two ATAG operators as being "half-black," Emery's internal records indicate that both ATAG operators were "black."

timely manner.

When Scott Sanders became his immediate supervisor, Dubuche was routinely denied the opportunity to "10-Key." Essentially, the "10-Key" operator was responsible for entering information regarding mail bundles into a computer. "10-Keying" was one of the duties of a mail sorter. The "10-Key" duty was not a promotion, but entailed far less physical labor than mail sorting. Although Dubuche received a high test score on the 10-Key machine, Sanders would not assign Dubuche to "10-Key." Dubuche was, however, assigned to "10-Key" by other shift managers.

At or about the same time Dubuche was being denied promotions and the opportunity to "10-Key," he was exposed to situations that he found hostile and discriminatory. For instance, during a discussion among co-workers about Emery's tuition reimbursement policy, Dubuche asked Sanders to explain the policy. In front of Dubuche's co-workers, Sanders stated that Dubuche need not worry about the policy, as it only applied to people who went to school.

In September of 1998, Elizabeth Larrea, a shift manager, compared Dubuche and Anthony Hanneman, Dubuche's co-worker, to

the men who shoveled coal in the engine room of the Titanic. Dubuche construed the comment as comparing him to a slave. On another occasion, Dubuche and Hanneman overheard a voice on Teebagy's hand-radio, which said "[c]ould you send a couple of black guys to the ball dock?" Hanneman Aff. ¶ 6; Dubuche Dep. 202-03. Unloading trucks at the ball dock was the most labor intensive job at Emery. Dubuche found the remark somewhat offensive.

Because he needed his job and did not want to cause problems, Dubuche did not immediately report the above incidents. In November 1998, however, he verbally complained to Emery's general manager, Michael Bruni. Subsequently, he also spoke with Teebagy, Robert Knowles, and other members of Emery's upper management. Soon after he complained, Sanders began to reprimand Dubuche for being tardy. Emery contends that Sanders verbally notified Dubuche that his tardiness was a problem in June 1998. Dubuche denies receiving such a notice. Regardless, Sanders issued Dubuche his first written warning for tardiness on January 19, 1999.

Dubuche received a final written warning for tardiness on

January 21, 1999.[5]  Upset at receiving the final warning, Dubuche approached Sanders to discuss the issue.  During the discussion, Dubuche told Sanders that he believed Sanders' actions in issuing the warnings and denying him the opportunity to "10-Key" were racially motivated.  Sanders became angry, told Dubuche he was fired, and ordered him to leave the premises.  Bruni and other members of upper management immediately responded to the situation and, after speaking with Dubuche, Bruni told him not to return to work until he submitted a written complaint regarding his claims of racial discrimination.  Dubuche was not paid for the time he missed while he drafted his complaint at home.

In early February, 1999, Bruni concluded his investigation of Dubuche's written complaint, determining that it was unfounded.  In a meeting with Dubuche, Bruni told him the outcome of his investigation.  Bruni also told him that he must be on time for work, and that he would be watching him.  Thereafter, management closely scrutinized Dubuche's work habits.  Unhappy with the results of the investigation and the scrutiny he found himself under, Dubuche filed a charge of racial discrimination

_____

[5]  Dubuche contends that the January warnings were later "rescinded" by human resources.

against Emery with the New Hampshire Human Rights Commission on February 26, 1999.

Approximately two weeks after filing his Human Rights Commission complaint, Dubuche received a warning for taking an extended break. About a week later, Dubuche received a final written warning for violating Emery's attendance and punctuality policy. The warning stated that Dubuche needed to have perfect attendance and punctuality for 60 days or be subject to discipline, including termination. Dubuche contends that this warning was later rescinded.

On March 25, 1999, Emery's electronic time card system did not record Dubuche's hours for the day. Emery kept time records for its employees by instructing them to "swipe" an electronic card through a sensor for its computerized time system at the beginning and end of their shift. A separate security system also recorded each employee's time in and out of the Emery complex. It was not uncommon for the time card system to malfunction or fail to record an employee's hours, and Dubuche had experienced such difficulties prior to March 1999. If the system failed to record an employee's hours, a manager would ask the employee how many hours he or she worked, and the manager

would then manually enter the time into the system. This was done informally, and employees were not asked to sign a time card or payroll document attesting to the information they provided the manager.

On March 26, 1999, Bruni and Judy Guilmette, Emery's human resources manager, met with Dubuche to discuss the time system's failure to record his work hours for the previous day. Bruni and Guilmette concealed the fact that the security system had logged Dubuche's entry into the building at 4:10 p.m. and had logged him out at 1:08 a.m. Instead, they told Dubuche that they had no record of him working the previous day. They asked Dubuche what time he arrived for work on March 25. Dubuche stated at his deposition, "I think it was 4:00. I don't remember exactly the time." Dubuche Dep. 171, 173. Dubuche admitted that it could have been past 4:00 p.m. Bruni asked Dubuche to sign a time card attesting to the fact that he had started work at 4:00 p.m. and had ended work at "1:05 - 1:07" a.m. After he signed the time card, Bruni showed Dubuche the security system log, which indicated that Dubuche had entered the building at 4:10 p.m. and had left at 1:08 a.m. Bruni informed Dubuche that by signing the time card, which indicated that Dubuche arrived at 4:00 p.m., not

4:10 p.m., Dubuche had falsified a payroll document.  Dubuche was terminated on March 30, 1999 for this action.

On August 3, 1999, Dubuche filed a second charge of discrimination with the New Hampshire Human Rights Commission, alleging retaliation.  Dubuche was issued a right-to-sue letter for each complaint filed with the New Hampshire Human Rights Commission.  He filed suit in this court on December 4, 2000, alleging that Emery violated Title VII and 42 U.S.C. § 1981 by discriminating against him because he was black.  More specifically, he alleges that Emery refused to promote him and forced him to work in a hostile work environment.  Dubuche also alleges that Emery violated Title VII's anti-retaliation provision when it suspended him without pay, subjected him to heightened scrutiny, and ultimately terminated him under false pretenses.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A material fact is one that affects the outcome of the suit. See id. at 248.

In ruling on a motion for summary judgment, I must construe the evidence in the light most favorable to the non-movant. See Navarro, 261 F.3d at 94. The party moving for summary judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249). While courts must exercise restraint in

granting summary judgment in cases "where elusive concepts such as motive or intent are at issue, this standard *compels* summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (quotation omitted, emphasis in original). I apply this standard in resolving the defendant's motion for summary judgment.

## III.   DISCUSSION

### A.   The Title VII Claims[6]

Dubuche alleges that Emery violated Title VII by: (1) refusing to promote him because he is black; (2) maintaining a hostile work environment; and (3) retaliating against him because he complained about the alleged racial discrimination. Emery challenges the sufficiency of plaintiff's Title VII claims. I review each claim in turn.

---

[6] Although Dubuche's claims are brought under both 42 U.S.C. § 1981 and Title VII, the legal standards that govern both claims are identical. See Conward v. Cambridge School Committee, 171 F.3d 12, 18-19 (1st Cir. 1999). Therefore, I discuss them as if brought solely under Title VII, and make no distinction between the two statutes. See id.

## 1. __Failure to Promote__

Dubuche alleges that Emery repeatedly refused to promote him because he is black. See 42 U.S.C. § 2000e-2(a)(1) (making it unlawful to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race"). Specifically, he alleges that he was denied promotions to ATAG operator and seasonal quality assurance associate positions.[7] Emery responds by claiming that it took these actions for legitimate, nondiscriminatory reasons and that Dubuche offers insufficient evidence to support his assertions that its actions were

_____

[7] Dubuche also claims he was denied a promotions to ramp clerk, CART operator and 10-key operator. However, it is undisputed that he was offered the ramp clerk position. Therefore, Dubuche cannot maintain a claim of discriminatory failure to promote based upon a position that was offered to him. Further, the records provided by Emery demonstrate that the job offer was rescinded because Dubuche failed to accept it in a timely fashion, not because he was black. Bruni Aff., Ex. 2B. Dubuche offers no evidence in rebuttal. As for Dubuche's claims that he was denied a promotion to CART operator and 10-Key operator, these jobs were not promotions. Dubuche Dep. 199-200. Further, Dubuche was assigned the duties of a CART and 10-Key operator on occasion, and was compensated for the work. See id. at 200, 265, 320-21. Based upon the record, CART and 10-Key duties were not promotions. Therefore, I do not address these "positions" in my analysis.

motivated by unlawful bias.

Because Dubuche's claim that Emery failed to promote him is based upon circumstantial evidence, I analyze it by applying the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000).

Under the first step of the burden-shifting framework, Dubuche must establish a prima facie case of discriminatory failure to promote by proving by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he applied for, and was denied, a promotion for which he was qualified; and (3) after the denial, Emery filled the position with someone with comparable qualifications.[8] See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000); McDonnell Douglas, 411 U.S. at 802; Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 32 (1st Cir. 1990). Dubuche's burden at this preliminary step is

---

[8] The precise requirements of a plaintiff's prima facie case will differ depending on the type of discrimination alleged and the specific employment practice at issue. See McDonnell Douglas, 411 U.S. at 802 n.13. I have tailored my description of the prima facie case to fit the contours of Dubuche's failure to promote claim.

"not onerous." <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>see</u> <u>Fernandes v. Costa Bros. Masonry, Inc.</u>, 199 F.3d 572, 584 n.4 (1st Cir. 1999) (describing the nature of proof required to establish a prima facie case as "de minimis"). If Dubuche succeeds in making his prima facie case, he creates a rebuttable presumption that Emery acted in a discriminatory manner. <u>See</u> <u>St. Mary's Honor Center. v. Hicks</u>, 509 U.S. 502, 506 (1993); <u>Burdine</u>, 450 U.S. at 254.

Construing the facts in the light most favorable to Dubuche, I conclude that he has established a prima facie case of discriminatory failure to promote. He is black and, therefore, a member of a class protected by Title VII. There is evidence in the record from which a reasonable jury could conclude that Emery failed to promote him, that he was qualified for the positions for which he applied, and that the positions were given to other individuals with comparable qualifications. <u>See</u> Dubuche Dep., Ex. 1; Ex. 11 (Bates stamp D070-072). Given that Dubuche's burden is minimal at this initial stage, I find that he has established a prima facie case.

Once the plaintiff has set forth a prima facie case, the burden shifts to the defendant, who may rebut the presumption of

discrimination by articulating a legitimate, nondiscriminatory reason for its actions. See Hicks, 509 U.S. at 506-07; Burdine, 450 U.S. at 253-54. The defendant's burden is solely a matter of production; the burden of persuasion remains at all times with the plaintiff. See Hicks, 509 U.S. at 508; Burdine, 450 U.S. at 257-58, 260. Emery has articulated a nondiscriminatory reason for not promoting Dubuche and has produced admissible evidence in support of its position. Emery asserts that it chose other individuals over Dubuche because they were better qualified and better suited for the job. See Bruni Aff., Exs. 2A, 2B, 2C.

Because both Dubuche and Emery have met their burdens at steps one and two of the McDonnell Douglas framework, the presumption of discrimination drops away, and I turn to the ultimate issue: whether Dubuche has presented sufficient evidence to prove that Emery intentionally refused to promote him because of his race. See Reeves, 530 U.S. at 153 ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."); Straughn v. Delta Airlines, Inc., 250 F.3d 23, 34 (1st Cir. 2001). There is "no mechanical formula" for determining whether a plaintiff's

-15-

evidence is sufficient to prove discrimination, <u>Feliciano De La Cruz v. El Conquistador Resort</u>, 218 F.3d 1, 6 (1st Cir. 2000); however, the plaintiff must "present sufficient evidence to show *both* that the employer's articulated reason [for the failure to promote was] a pretext and that the true reason [was] discriminatory." <u>Straughn</u>, 250 F.3d at 34 (quotations omitted) (emphasis in original).

A "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit [, but does not compel,] the trier of fact to conclude that the employer unlawfully discriminated." <u>Reeves</u>, 530 U.S. at 148. Whether such a showing is sufficient to prove discrimination will depend upon the circumstances of the case, including "the strength of the plaintiff's prima facie case, [and] the probative value of the proof that the employer's explanation is false." <u>Id.</u> Of course, a plaintiff may choose to offer additional evidence of discriminatory intent in order to buttress his claim and satisfy his burden of proof. <u>See</u> <u>Feliciano De La Cruz</u>, 218 F.3d at 10.

Regardless of the type or quantum of proof offered by the plaintiff, a court, in evaluating a motion for summary judgment,

should consider all relevant evidence of pretext and discrimination in the aggregate. See Dominquez-Cruz, 202 F.3d at 431; Fernandes, 199 F.3d at 581. In other words, the appropriate inquiry is whether, based on the totality of the evidence, a reasonable jury could infer that the defendant's proffered explanation was pretextual and that the defendant was actually motivated by discriminatory animus. See Feliciano De La Cruz, 218 F.3d at 6-7; Dominquez-Cruz, 202 F.3d at 431. The First Circuit has cautioned that courts making this inquiry into an employer's motivation should be especially reluctant to grant summary judgment in the employer's favor. See, e.g., Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998).

Applying these legal principles, I conclude that Dubuche has failed to carry his burden of proffering competent evidence that, together with all reasonable inferences which may be drawn in his favor, raises a genuine issue of fact as to whether Emery's refusal to promote him was motivated by discrimination. Straughn, 250 F.3d at 34. In regard to the ATAG operator position, Emery's contemporaneously generated records indicate that Dubuche was not selected due to his lack of "reliability," which was a key criteria listed for the ATAG position. See Bruni

Aff. ¶15, Ex. 2C. This is wholly consistent with Dubuche's admission that he was often late to work. Further, any allegation that Emery refused to promote Dubuche because he was black is seriously undermined by the fact that Emery promoted black employees for both ATAG operator openings. See id. Aside from Dubuche's belief that he was better qualified for the job, he presents no relevant evidence that Emery's reasons for denying him promotions were a pretext for discrimination.

With respect to the seasonal quality assurance position, the candidates Emery selected had significant accounting, auditing, or quality assurance backgrounds, which Dubuche lacked. See Bruni Aff., Ex. 2A; Dubuche Dep., Ex. 1. Again, Emery's contemporaneously-generated records indicate the nondiscriminatory reasons for its selections, including the specific qualifications and credentials of each candidate chosen and why they were the best for the job. See Bruni Aff., Ex. 2A.

In sum, Dubuche presents no evidence from which a reasonable fact finder could conclude that those involved in selecting the successful applicants for the ATAG operator and seasonal quality assurance positions believed that he was the best qualified applicant but selected another applicant instead. Dubuche has

-18-

failed to raise a genuine factual dispute as to whether Emery's articulated reasons for failing to promote him to the ATAG operator or seasonal quality assurance positions were a pretext for unlawful discrimination. Accordingly, I grant Emery's motion for summary judgment with regard to this claim.

## 2. Hostile Work Environment

Title VII prohibits discrimination caused by a racially hostile work environment. See Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 13 (1st Cir. 1999). In order to prevail on such a claim, the plaintiff must "establish that the harassment was so 'severe or pervasive' as to alter the terms of [the plaintiff's] employment, creating a work environment that was both objectively hostile and perceived as hostile by [the plaintiff]." Marrero v. Goya of Puerto Rico, Inc., No. 01-1984, 2002, WL 1962144, at *4 (1st Cir. Aug. 28, 2002) (quoting Faragher v. Boca Raton, 524 U.S. 775, 786 (1998). This is not a precise test, and "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

-19-

unreasonably interferes with an employee's work performance." Gorski v. New Hampshire Dept. of Corrections, 290 F.3d 466, 472 (1st. Cir. 2002) (quotations omitted).  Generally, a hostile work environment occurs when "there are a series of events which mount over time to create such a poisonous atmosphere as to violate the law."  O'Rourke v. City of Providence, 235 F.3d 713, 727 (1st Cir. 2001).  However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher, 524 U.S. at 788 (quotations omitted); accord Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001) (per curiam).  It is against this legal backdrop that I review Dubuche's hostile work environment claim.

Dubuche contends that the following events created a racially hostile work environment: (1) the comment overheard on Teebagy's hand-radio stating "could you send two black guys to the ball dock"; (2) Larrea's comment that Dubuche and a white co-worker reminded her of the men who shoveled coal in the engine room of the Titanic; and (3) Sanders' comment that Emery's tuition reimbursement policy was only for those who went to school.  See Plf's. Mem. Supp. Obj. to Mot. for Summ. J., p.21.

-20-

Dubuche's own deposition testimony debunks the notion that these incidents give rise to a poisonous and denigrating atmosphere charged with racial hostility or abuse. First, Dubuche was only "somewhat" offended at the comment he overheard on Teebagy's radio. Dubuche Dep. 206. Regardless, he still felt "comfortable" working at Emery. Dubuche Dep. 208. As for Sanders' comment that Emery's tuition policy only applies to "people that go to school," Dubuche Dep. 208-09, it lacked a focused attack against Dubuche's racial background. Further, when asked whether Dubuche thought Sanders was joking, he responded that he was uncertain "how [Sanders] intended [the remark." Dubuche Dep. 209. Lastly, Larrea's comment regarding the Titanic also lacked a focused attack against Dubuche's racial background. Indeed, the comment was directed at Dubuche and a white co-worker. When asked whether Larrea meant any ill-will by her comment, Dubuche stated that "[w]ell, she only said it because I was sweating and . . . when you look at the movie [Titanic] . . . that's pretty much [how] those people [looked]." Dubuche Dep. 217. Larrea contends that her comment was not meant to compare Dubuche to a slave, but rather to compare the "never ending work" of Dubuche and his co-worker with the workers of the

Titanic. Bruni Aff., Ex. 3B (Larrea's statement to Human Rights Commission).

I conclude that Dubuche has failed to establish that the alleged harassment was so "severe or pervasive" as to create a "work environment that was both objectively hostile and perceived as hostile by [Dubuche]." Marrero, 2002 WL 1962144, at *4. Aside from the comment overheard on Teebagy's radio, the comments were isolated, offhand remarks that lacked racial overtones. Although I do not condone the type of comment overheard on Teebagy's radio, this lone, stray remark is not enough to establish a hostile work environment claim. See Faragher, 524 U.S. at 788. Therefore, Emery is entitled to summary judgment.

3. **Retaliation**

Emery next argues that Dubuche fails to establish a prima facie case of retaliation. See 42 U.S.C. § 2000e-3(a) (making it unlawful for an employer to discriminate against an employee who has opposed any unlawful employment practice, "or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" regarding discrimination). In the alternative, Emery argues that the employment actions it took were not retaliatory.

Once again, I use the burden-shifting framework established by the Supreme Court to analyze Dubuche's claim.  See McDonnell Douglas, 411 U.S. 792.[9]  To establish a prima facie case of retaliation, Dubuche must show by a preponderance of the evidence that:  (1) he engaged in conduct protected by Title VII; (2) he suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity.  White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 262 (1st Cir. 2000).  If Dubuche establishes his prima facie case, the burden of production shifts to Emery, who must respond by articulating a legitimate, nondiscriminatory reason for the adverse employment action.  See King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997).  If Emery meets its burden of production, the presumption of retaliation falls away and Dubuche must prove that Emery's explanation is actually a pretext concealing a retaliatory motivation.  See id.

I conclude that Dubuche has established a prima facie case of retaliation.  Because reporting or complaining about racial

---

[9]  I reject Dubuche's invitation to analyze this claim under a mixed-motive framework.  The evidence presented by Dubuche does not compel such an analysis.  See Fernandes, 199 F.3d at 581-83; Kirk v. Hitchcock Clinic, 261 F.3d 75, 78 (1st Cir. 2001).

discrimination is a protected activity, see 42 U.S.C. § 2000e-3(a), Dubuche's verbal and written complaints most certainly qualify as protected activity. See White, 221 F.3d at 262; Hoeppner v. Crotched Mountain Rehab. Ctr., Inc., 31 F.3d 9, 14 (1st Cir. 1994). After engaging in this protected activity, Dubuche was warned about his attendance, suspended without pay, and ultimately discharged. These changes in the condition of his employment constitute adverse employment actions. See White, 221 F.3d at 262. Therefore, there is no dispute that Dubuche has established the first two elements of his retaliation claim.

In order to complete his prima facie case, Dubuche must "point to evidence in the record that would permit a rational fact finder to conclude that the employment action was retaliatory." King, 116 F.3d at 968; Hoeppner, 31 F.3d at 14. "One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994). Although there is no bright line rule defining "temporal proximity," the Supreme Court has stated that the employer's adverse action must be "very close" in time to the protected activity. Breeden, 532 U.S. at 271. I may also

consider such factors as the sequence of events leading to the adverse action, and whether the employer departed from normal procedures. Hodgens, 144 F.3d at 168-69. "In addition, doubts about the fairness of an employer's decision . . . while not dispositive, may be probative of whether the employer's reasons are pretexts for [retaliation]." Id. (quotations omitted).

Here, approximately two months after Dubuche's November complaint about Sanders' alleged racial discrimination, Sanders began issuing warnings to Dubuche. Further, when Dubuche brought his complaints directly to Sanders in January 1999, Sanders contemporaneously attempted to fire Dubuche and remove him from the building. See Dubuche Dep., Ex. 12 (Bates stamp D073); Dubuche Aff. ¶ 33; Kendrick Aff. ¶ 18; Bruni Aff., Ex. 1. Bruni responded to the January confrontation between Dubuche and Sanders by suspending Dubuche without pay. Dubuche also contends that Emery engaged in "a campaign of stalking and harassment," which culminated in Dubuche's termination, in response to Dubuche's complaints. Drawing all inferences in Dubuche's favor, and in light of the relatively low threshold showing necessary to establish a prima facie case, I conclude that this is enough to satisfy Dubuche's burden of establishing a causal connection

between the employment action and the protected activity.

To rebut the inference of discrimination created by Dubuche's prima facie case, Emery must articulate a legitimate, nondiscriminatory reason for the adverse employment action. See King, 116 F.3d 965, 968. Emery asserts that Dubuche's chronic tardiness and disregard for its attendance and punctuality policy was the reason for the warnings issued to Dubuche. Further, it denies that it engaged in a campaign of stalking and harassment and that its decision to terminate Dubuche was based solely upon his falsification of a payroll document. While the truth of these justifications is disputed, Emery has articulated legitimate, nondiscriminatory reasons for its actions.

As the presumption of retaliation has fallen away, Dubuche must prove that Emery's explanation is actually a pretext concerning a retaliatory motivation. See id. In evaluating Dubuche's proffer, I examine all the circumstances, including, but not limited to: temporal proximity between the adverse action and the protected activity; the sequence of events; the employer's departure from normal procedures; and the fairness of the employer's decision. Hodgens, 144 F.3d at 169; King, 116 F.3d at 968; Wyatt, 35 F.3d at 16. Whatever the sources of his

-26-

proof, Dubuche, in order to survive summary judgment, "must present evidence from which a reasonable jury could infer that the [Emery] retaliated against him for engaging in [protected] activity." Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991).

Dubuche, through his deposition testimony and Kendrick's affidavit, presents evidence that he first complained of racial discrimination to Bruni and other members of Emery's upper management in November 1998.[10] See Dubuche Dep. 196-97, 297, 310; Dubuche Aff. ¶ 32; Kendrick Aff. ¶ 6. Prior to November, although Dubuche was late for work over 50 times in 1998, he was never issued a written warning.[11] See Dubuche Aff. ¶ 4. Two months after his November complaint, he began receiving written warnings from Sanders for tardiness. The temporal proximity

---

[10] Bruni contends that Dubuche never spoke to him about discrimination in November. I need not determine whether Dubuche or Bruni is telling the truth, however, because such credibility determinations are for the fact finder at trial, not for me at summary judgement. Simas v. First Citizens' Federal Credit Union, 170 F.3d 37, 49 (1st Cir. 1999).

[11] I note that Emery contends that Sanders spoke with Dubuche about his tardiness in June of 1998. See Sanders Aff. ¶ 8, Ex. 3. Dubuche disputes this contention. Again, such a credibility determination is for the fact finder at trial. See Simas, 170 F.3d at 49.

between Dubuche's November complaint and the tardiness warnings is circumstantial evidence of retaliation. See Wyatt, 35 F.3d at 16.

Dubuche also presents evidence that an unwritten policy existed at Emery that employees would not be reprimanded for tardiness, so long as they worked hard and put in overtime. Dubuche Aff. ¶ 15; Dubuche Dep. 100; Kendrick Aff. ¶ 5. Emery does not dispute that Dubuche was a hard worker and frequently put in overtime. Nonetheless, it departed from its alleged unwritten policy and began reprimanding Dubuche for his tardiness two months after Dubuche levied his November complaint. Such a departure from Emery's normal policies and procedures tends to support an inference of a retailatory motive. See Hodgens, 144 F.3d at 169.

When Dubuche confronted Sanders on January 21, 1999 and accused him of racial discrimination, Sanders attempted to fire him and told him to leave the building. Bruni's own investigation into the incident states that Sanders "told [Dubuche] to get out of the building." Bruni Aff., Ex.1. In response to the confrontation between Sanders and Dubuche, Bruni told Dubuche that he would not investigate Dubuche's complaints of racial

discrimination until he received them in writing.  See Bruni Aff., Ex. 1.  There is no policy requiring an employee to submit a complaint in writing.  See Dubuche Dep., Ex. 7 (Employee Handbook, Bates stamp D468).  Indeed, under the three options available to an employee alleging discrimination, none indicate that the employee must submit a written complaint; rather, each option highlights Emery's goal of assisting the employee to resolve the complaint.  See id.

Bruni's memorandum regarding his investigation, viewed in a light most favorable to Dubuche, indicates that Dubuche was suspended without pay until he submitted a written complaint.  See Bruni Aff., Ex. 1.  Such action contradicts Emery's written procedures and policies of assisting the employee in resolving complaints of discrimination.  See Dubuche Dep., Ex. 7 (Employee Handbook, Bates stamp D468).  After he filed his internal complaint, Dubuche contends that Bruni told him that he would be "watching [him]" and would "get reports on [him]."  Dubuche Dep. 285.

Emery's nondiscriminatory reason for terminating Dubuche for falsifying a payroll document is suspect when viewed in a light most favorable to Dubuche.  First, Dubuche presents evidence that

if the time system failed to record an employee's hours, a manager would ask the employee to provide his or her time. The manager would then manually enter the time into the system. See Dubuche Dep. 178, 179; Kendrick Aff. ¶ 21. Employees were not required or asked to sign a time card or payroll document attesting to their hours. See id. Curiously, Emery proffers nothing to dispute this evidence. Despite this alleged informal policy, Bruni required Dubuche to sign a payroll document attesting to the hours he worked on March 25, 1999. Once again, such a departure from normal procedure lends credence to Dubuche's claim of retaliation. See Hodgens, 144 F.3d at 169. Second, if, as Emery contends, Dubuche was on final warning for attendance and punctuality, there was no need for Emery to conceal the security log. Indeed, Emery could have simply shown the log to Dubuche and terminated him for failing to meet the requirements of the final warning (60 days of perfect attendance). Instead, Emery officials asked that Dubuche sign a time card and then fired him for falsifying it. One could infer that Dubuche was not on final warning and that Emery simply created a pretextual reason to terminate Dubuche.

After considering the above facts and circumstances, I

-30-

conclude that Dubuche has provided evidence from which a reasonable fact finder could conclude that Emery's reasons for issuing warnings to Dubuche, monitoring him, and ultimately firing him were retaliatory.  I therefore deny Emery's motion for summary judgment as it pertains to Dubuche's claim of retaliation.  See 42 U.S.C. § 2000e-3(a).

## V.  CONCLUSION

For the foregoing reasons, I grant Emery's motion for summary judgment (Doc. No. 13) as it pertains to Dubuche's discriminatory failure to promote and hostile work environment claims, and deny the motion as it pertains to Dubuche's claim of retaliation under 42 U.S.C. § 2000e-3(a).  I also deny Emery's motions to strike Dubuche's affidavits (Doc. Nos. 17, 18, 19).


SO ORDERED.


_____
Paul Barbadoro
Chief Judge


October 9 , 2002

cc:  David Garfunkel, Esq.
     Jaclyn Kugell, Esq.
     Francis Murphy, Esq.