Sean **PROA**, et al., Plaintiffs

v.

**NRT MID ATLANTIC, INC.,**
et al., Defendants.

Civil Action No. AMD 05–2157.

United States District Court,
D. Maryland.

May 27, 2009.

---

Clayborne E. Chavers, The Chavers Law Firm PC, Patrick J. Massari, Law Office of Patrick J. Massari, Washington, DC, Sheryl Satzberg Levy, William Thaddeus Coleman, III, Berger and Montague PC, Philadelphia, PA, for Plaintiffs.

Paul J. Kennedy, Erik Christian Johnson, Joseph P. Harkins, Steven E. Kaplan, Littler Mendelson PC, Washington, DC, Cristina M. Rodriguez, Bank of America, Charlotte, NC, for Defendants.

## MEMORANDUM OPINION

ANDRE M. DAVIS, District Judge.

Plaintiffs, Sean Proa, Margaret Jordan, and Gary Schiff, three licensed real estate agents, seek damages and injunctive and declaratory relief on theories, *inter alia*, of racial and religious discrimination in respect to the operation of a Chestertown, Maryland, real estate brokerage with which they were affiliated. Defendants are: (1) NRT Mid Atlantic, Inc., apparently a Maryland corporation, which owned and operated the Chestertown Coldwell Banker real estate brokerage; (2) NRT, Inc., a Delaware corporation and the parent of NRT Mid Atlantic, Inc.; (3) Angela Shearer (now Othoson), the former branch manager of the Chestertown brokerage; and (4) Sarah Sinnickson, a Regional Vice President of the corporate parties and Shearer's immediate superior.

Plaintiffs insist, despite the absence of any probative evidence to support the assertion, that they were "employees" of the brokerage and not independent contractors. In any event, they allege that they suffered serious pecuniary and non-pecuniary injuries because the branch manager of the brokerage, defendant Shearer, systematically undermined any realtor in the office who was not Caucasian and Christian, and that Sinnickson tolerated, if she did not condone, Shearer's discriminatory acts and omissions.

Some of the claims originally asserted by plaintiffs have been dismissed or abandoned. *See Proa v. NRT Mid Atlantic, Inc.*, 477 F.Supp.2d 677 (D.Md.2007). Now, after a prolonged and contentious period of discovery, *see Proa v. NRT Mid Atlantic Inc.*, 608 F.Supp.2d 690 (D.Md. 2009), before the court are defendants' renewed motions for summary judgment on all remaining claims. No hearing is needed. For the reasons stated within, defendants' motions shall be granted as to plaintiffs' federal law claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16 et seq., and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. The court declines to exercise supplemental jurisdiction over the state law claims; accordingly, the remaining state law claims for breach of contract shall be dismissed without prejudice for lack of jurisdiction.

### I.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if, considering all the evidence, no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material

if it may affect the outcome of the case. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this initial burden, the non-moving party must set out specific facts showing a genuine issue for trial to avoid summary judgment. Fed.R.Civ.P. 56(e)(2).

## II.

The cardinal facts shall be set forth in the light most favorable to plaintiffs, but only to the extent that plaintiffs' allegations have more than a scintilla of evidentiary support.

## A.

Proa is an African–American man who was affiliated with the brokerage, as relevant to this case, from September 2002 through January 2004. Jordan is a Caucasian woman whose husband is African–American. Jordan was affiliated with the brokerage from April 2003 until March 2004. Schiff is a Jewish man who began working at a predecessor brokerage in 1999 where Shearer was the branch manager. Schiff remained affiliated with the brokerage through subsequent mergers until 2006. In keeping with the practice of the parties, I shall refer to the Chestertown Coldwell Banker brokerage as "CBRB."

A summary of the contractual arrangements relevant to this case will be useful. As licensed real estate sales associates, in becoming affiliated with CBRB, Proa, Jordan, and Schiff all signed Coldwell Banker Broker–Salesman Independent Contractor Agreements ("CB Contract"). (Schiff later signed a slightly modified contract.) The CB Contract plainly contemplates that a typical associate affiliated with CBRB maintains a high level of autonomy. Sales associates were, of course, required to follow all applicable ordinances, law, rules, and regulations at all times while discharging their duties under the agreements. (CB Contract § 4.)

Associates are exclusively paid based on the commissions that they earn by completing purchase, sale, and lease transactions; CBRB provides no employee benefits such as health, disability, or retirement benefits. (*Id.* § 5h.) Moreover, the CB Contract explicitly states that the associates were not treated as employees for purposes of workers' compensation or unemployment compensation insurance programs required by state and federal law. (*Id.*)

To be sure, the branch manager exercises significant authority in certain business-related areas, and indeed, is required by state law to do so. *See* Md.Code, Bus. Occ. & Prof., § 17–518. Under Maryland's regulatory framework, CBRB was required to provide the very type of supervisory oversight that plaintiffs cite as grounds for their complaints. Real estate brokerages are required to "exercise reasonable and adequate supervision over … associate brokers." Md.Code Regs. 09.11.05.02. Supervision is defined as including the following: training sessions, the availability of experienced supervisory personnel to review and discuss brokerage agreement provisions and advertising, and evidence "records of attendance at sales meetings" and "review by the broker, branch officer manager … of advertisements to be placed by licensees affiliated with the broker." *Id.* 09.11.05.03.

Accordingly, Shearer was permitted and, indeed, required to "supervise" sales associates, particularly newly-licensed, inexperienced sales associates such as Proa and Jordan. For example, associates must file new listings and buyer agency agreements with the brokerage in a timely manner. (CB Contract § 7a.) Additionally, the branch manager and associate jointly approve all correspondence from the associate pertaining to real estate transactions, including the forms and contracts for the purchase of property, and all documents become the property of the brokerage. (*Id.* § 7b, § 7c, § 7c, § 7d.) The brokerage must approve any specific sale or lease before the associate may bind the brokerage. (*Id.* § 7f.) And, as mentioned, the associates are always required to comply with all applicable laws, rules, and ethical guidelines. (*Id.* § 4.)

Clearly, apart from using appropriate forms and following applicable laws and guidelines, under the CB Contract, an associate is free to pursue commission income in any lawful manner. (Associates could even have another job; Schiff was a part-time teacher.) On a typical day, associates may work a lot or very little, as they choose. (*Id.* § 2b.) Additionally, the associate may choose where to work. Although CBRB maintains the office in the market area with furnishings and equipment, (*Id.* Recital B.), the associate is not required to work in any particular location. Thus, a typical associate might spend a given morning showing a buyer a potential new home, developing new advertising materials in the office to attract new sellers, or helping a potential buyer secure financing at a local bank. Perhaps the associate will decide not to work at all one day and host an open house that night. (*Id.* § 2d.) In sum, associates have discretion over their own schedules.

There are only minor exceptions to this discretion. New associates must attend a general orientation program and a "floor time" orientation, and must consent to working with a more senior associate if they need to gain specific technical expertise relating to real estate transactions. (*Id.* § 2d, § 2e, § 2f.) Additionally, all associates may sign up for "floor time" or "opportunity time," and if they request such time, then they must staff the office during their assigned time. Associates are also requested but not required to attend twice-monthly sales meetings and to return client calls within four hours. (*Id.* § 2c.)

The two "requests" mentioned above appear in the CBRB policy and procedures manual, a document issued by Shearer to associates. Under the CB contract, "[CBRB] may make available to Independent Contractor the policy and procedures manual of the Broker. . . . [T]he content of answers will be advisory only and shall not be construed as requiring strict compliance." (*Id.*) Accordingly, consistent with the CB contract, many, indeed, most of the advisory content of the policy and procedures manual were not binding. Thus, for example, although the manual included an expectation that associates would reach a minimum production of one million dollars in annual sales, the minimum was not binding. It is undisputed, in fact, that the goal did not reflect reality: At least one-quarter, and often as many as one-half of all associates fell short of the million dollar goal in 2000–2006. (Paper 130, Ex. 2.)

\* \* \*

To an overwhelming degree, plaintiffs' theories of liability rest on the untenable assertion, not remotely supported by the undisputed facts in the record, that Shearer had the power and the authority to exercise comprehensive control over their work, their comings and goings, and their

overall strategy as independently-licensed entrepreneurs. This is flatly wrong as a matter of law. What can be said with fair assurance is that, to the extent that Proa and Jordan (but not Schiff, who remained affiliated with CBRB for more than a year even after this case was filed) were newly-licensed real estate professions, they were wise to pay close attention to the more experienced guidance they received from others, including Shearer. As noted within, the option of "going their own way" in derogation of more experienced counsel was fraught with danger, both for themselves and for the brokerage. In any event, if plaintiffs felt more restrained in their freedom of action than their written agreements clearly allowed, it is their own crabbed understanding of their professional prerogatives, and not some hidden power possessed by their branch manager, that was the source of their ostensible lack of freedom.

### B. Proa

Proa is an African–American man who was affiliated with the CBRB Chestertown office from September 2002 (when Shearer agreed to accept his affiliation, obviously with knowledge that he was black) through January 2004, when he transferred to the Easton, Maryland, CBRB office. Early on, Shearer sent him to a specialized training at the Floyd Wichman School of International Real Estate at the company's expense, one of few associates to have this privilege. (Proa dep. at 186.) Proa quickly prospered at CBRB; he was in the top quartile of associates in 2003 and he sold almost 1.5 million dollars worth of real estate in 2004. (Paper 130, Ex. 2.)

Proa alleges that Shearer aggressively dominated and controlled the office and that she acted in a racist manner. He states that Shearer told him to not put his photo on his business card because his "face would not help [him] sell real estate in Chestertown." (Proa dep. at 279–80.) (Mary Flanagan, a white real estate associate who succeeded Shearer as branch manager, testified that she was "essentially told the same thing [as Proa], because it was not customary in the region to do—to put your picture on [business cards]." (Flanagan dep. at 200.)) He claims (as does Jordan) that Shearer "required" him to attend sales meetings, but made them optional for others, although he admits that he did not attend many meetings. (Proa dep. at 253–55.) Proa also wanted a mentor and never received one, and he claims that Shearer "controlled" his office hours and conduct in the office.

Proa purports to identify five specific transactions and incidents which are probative of Shearer's bigoted treatment of him: (1) Pine Street; (2) Millbrook Drive; (3) Church Hill Lane; (4) Water Street; and (5) the Oak Hollow Town Homes.

*Pine Street:* Shearer allegedly called a bank official and instructed her to cancel the financing for an African–American buyer represented by Proa because the buyer was black. Proa was meeting with the bank representative when she received Shearer's call. (*Id.* at 294–99.)

*Millbrook Drive:* Shearer required him to share a commission with Scott Othoson because she was romantically involved with him. (*Id.* at 183–85.)

*Church Hill Lane:* Shearer removed Proa's listing and represented the property herself. (*Id.* at 196–98.)

*Water Street:* Shearer rejected receipt of the buyer's commission in a transaction. Proa represented both the buyers and sellers in violation of a Maryland law that prohibits dual agency. (*Id.* at 309–313.)

*Oak Hollow Town Homes:* Proa sought to represent the sellers in a new residential development. He invited Shearer to attend a meeting with the develop-

ment manager. Shearer initially agreed to the meeting, but later declined to attend. Proa believes that her withdrawal cost him the representation. (*Id.* at 193, 325–29.)

Proa seems to believe that Shearer's race-based animus was exacerbated upon her growing realization that he was doing such a fine job that she could soon become the branch manager of an office where the leading sales associate was an African–American. According to Proa, this was a source of real concern to her.

In December 2003, Proa and Shearer were at daggers drawn over Proa's attempts to represent both the sellers and buyers in the same transaction and Shearer's efforts to thwart that effort. Matters between Proa and Shearer came to head at a breakfast meeting with Sinnickson on January 16, 2004, which had been requested by Proa to discuss alleged "harassment" by Shearer of Proa. Proa claims he believed the meeting would involve only himself and Sinnickson but when he arrived, Shearer and Sinnickson were seated together in the restaurant. (*Id.* at 344–45.) Proa claims that he was immediately informed that his services were no longer needed at the Chestertown office. Proa then asked if he could transfer to Easton, and Sinnickson agreed. Proa joined the Easton office within a week and remained affiliated with that office for some time. Proa argues that he was "fired" from the Chestertown office. Defendants contend that, simply to resolve Proa's unhappiness at the Chestertown office, he accepted a voluntary office transfer.

### C. Jordan

Jordan first met Shearer when Jordan retained Shearer to help Jordan and her husband find a home in Chestertown in late 2001, when they relocated from the West Coast. Apparently, the relationship was mutually respectful and went well; after the purchase, Jordan bought Shearer a necklace to show her appreciation for her help. (Jordan dep. at 132.) After she moved to Chestertown, Jordan obtained her real estate license, and in 2003, with the support of Shearer, she affiliated with CBRB. These facts grievously undermine Jordan's insistence that, because her spouse was African–American, Shearer had an immediate and unending race-based animus against her on the basis of her associations with African–Americans.

In any event, Jordan attests that during her tenure at CBRB, she heard Shearer make various distasteful comments, rooted in well-worn stereotypes, about minority groups, including African–Americans and Jews, and also about people with physical disabilities. Shearer told Jordan that she "was going to be set up to lose her real estate license" because her husband was African–American. (*Id.* at 164–65.) On one occasion, when Jordan hired three African–Americans to help prepare a house for sale, Shearer commented "[y]ou have to be careful who you deal with, you know. These people use the system." (*Id.* at 173–74.) Shearer also told Jordan not to work with Jewish clients because "they do business differently, and you're going to get sued." (*Id.* at 192–95.) Additionally, Jordan asserts that Shearer complained regularly about Proa, accusing him at one time of stealing from the office. (*Id.* at 288–90.) Allegedly, Shearer "required" Jordan to attend sales meetings that were optional for others. (Proa dep. at 253–55.)

Shearer did not always help Jordan win clients and advance her career. One time, Shearer told Jordan to not represent a disabled client whose home was in disarray. (Jordan dep. at 232–49.) Shearer also refused to help Jordan secure the representation of a group of African–American and Middle Eastern prospective investors interested in purchasing a large

property. (*Id.* at 216–17.) And, Shearer was less than enthusiastic in helping Jordan show a specific property on Lovely Lane to African American prospective investors. (*Id.* at 226–30.)

The growing tension between Jordan and Shearer boiled over on or about March 10, 2004, in the office. Shearer started yelling at Jordan because Jordan had allegedly defied Shearer's instruction to not represent certain clients. Jordan packed up her belongings and headed for the door. Shearer asked Jordan if she was quitting. Jordan replied, "No Angela. I love my job here. You give me no choice. I'm going to have to try to [transfer] to [the Easton, Maryland, office] like Sean." (*Id.* at 272.) Shearer then made physical contact with Jordan, blocking the door behind her, but not physically pushing or shoving her. Jordan left the building and went to her car. She did not return to the CBRB office after that conversation. Jordan viewed her departure from the office as involuntary; Shearer believed that Jordan voluntarily ended her affiliation with CBRB. (*Id.* at 271–74.)

Thereafter, Jordan met with Sinnickson and Shearer, seeking to return to CBRB. She explained that Shearer "fired" her but that she wanted to maintain the affiliation. Sinnickson denied her request. (*Id.* at 302–03.) Jordan applied to affiliate with the Easton office of CBRB but she was unsuccessful after Shearer contacted the branch manager there and advised him against taking her on. (*Id.* at 307–08.)

### D. Schiff

Schiff affiliated with CBRB in 2001 when CBRB acquired the brokerage with which Schiff was then affiliated in Chestertown. Schiff was a retired college president for which the real estate industry was something of a second (or third) career. In addition, he was highly involved in the Jewish community and the religious community more generally throughout his tenure at CBRB. He initiated a Havurah (an association used to support religious activities, in particular the celebration of the high holy days, and various types of social activities) in the community and served as the Cantor of the organization. He also served as the elected present of the Chester Valley Minister's Association from 2005–2007.

Schiff witnessed Shearer yell at sales associates, including Stewart Baldwin and Shirley Murray, both of whom are white, Christian associates, and threaten to take away their duty time for inconsequential reasons. (Schiff dep. at 132.) He recalls "horrendous scenes of [Shearer] humiliating [Baldwin and Murray]." (*Id.*) Plaintiffs point to Shearer's behavior toward Baldwin and Murray as "exceptions" to her otherwise singular animus against "nonwhite, non-Christian" sales associates; plaintiffs say these two drew Shearer's ire only because they were "in their 70s." (Paper 208, Ex. A.2 at 43.)

Schiff believes that Shearer subjected him to religious and racial discrimination and harassment because he is Jewish. She did not permit him to list his leadership positions within the Jewish community on the CBRB website, (Schiff dep. at 175–76), even though she permitted Scott Othoson to include a biblical quotation on his website. (Othoson dep. at 112–14.) Shearer stated that "Jews [were] greedy, money hungry." (Schiff dep. at 139–40.) She also once allegedly told a prospective associate that "those people are making too much money" while gesturing at Schiff's desk. (*Id.* at 205.) When Schiff approached her with a business idea regarding the sale of property he owned, she responded by saying, "[w]e know how much you people like to have money" (*Id.* at 142.) Additionally, during a discussion about the Christmas holiday, Shearer told

Schiff that she was "the true Jew" because she was Christian. (*Id.* at 163–64.) (Shearer denies making all of these and similar statements, but for purposes of summary judgment practice, the court credits plaintiffs' account.)

Schiff also points to the following specific transactions as indicia of Shearer's animus towards him:

*South Water Street:* Shearer removed Schiff as the seller's agent and inserted herself, contending that the customer had complained about Schiff. After Schiff determined that the customer did not complain, Shearer gave the listing back to him. (*Id.* at 294–302.)

*David Street:* Shearer tried to steal part of the commission by temporarily placing her name rider on the sign outside the property. Shearer later removed the rider once he complained about it. (*Id.* at 325–38.)

*"Women in Need" Property:* Schiff represented an owner in the lease of a commercial property formerly used as a supermarket. Shearer arranged directly with the owner for the charitable organization, "Women in Need," of which she was a board member, to rent the property temporarily for free and then later at a favorable rent by agreeing that no realtor would collect commission on the deal, thereby cutting CBRB and Schiff out. (*Id.* at 302–10.)

*Oak Hollow Property:* Schiff made a referral to Kay Gattling, the agent for the Oak Hollow development. He believed that Gattling would ensure that he received the appropriate commission. He eventually received a commission directly from Gattling, but believes that Shearer prevented him from receiving it for some period. (*Id.* at 344–45; Gattling dep. at 70–83.)

*Massey Property:* Shearer refused to support Schiff in a controversy about whether Schiff or another associate should receive the commission on a property sale in Massey, Maryland. (Schiff dep. at 385–87.)

Schiff also mentions an instance in which Shearer was helping him negotiate a million dollar property in a predominately white neighborhood for a while and then stopped helping him after she met with the prospective purchaser and discovered that the couple was African–American. (*Id.* at 357–64.)

At some point, Schiff asked Shearer to not schedule him for floor duty on Saturdays so he could observe the Jewish Sabbath, and not to schedule him on Sundays so that he could participate in meetings of his interdenominational religious group. (*Id.* at 235–38.) Shearer screamed at Schiff and berated him for the request, and stated that he would not receive weekday office hours if he refused to work on weekends. (*Id.* at 246–47.) Schiff then called the regional vice president (believing, apparently, it was Sinnickson, although she had not yet assumed that position) who allegedly refused to intervene. (*Id.* at 262–63.)

Schiff proceeded to work on Saturdays, despite his religious obligations, for three or four years. In 2005, he began to exclude Saturdays from reports of his availability to perform office hours for the following month. According to Schiff, immediately afterwards, his shifts decreased from seven to ten shifts per month to one to three. (Schiff decl. ¶ 7.) (As discussed *infra* p. 469, the documentary evidence flatly contradicts Schiff's beliefs in this regard.) Schiff eventually terminated his affiliation with CBRB. In the first amended complaint filed in this action some two months after the case was instituted, he joined this action as the third plaintiff.

### III.

■ Proa and Schiff purport to allege claims under Title VII. (Jordan's Title VII claims have been dismissed as untimely.) Under that statute, they may only make such claims if they are employees, since Title VII does not apply to independent contractors. *Cilecek v. Inova Health Sys. Servs.,* 115 F.3d 256, 259 (4th Cir.1997); *Farlow v. Wachovia Bank of N.C., N.A.,* 259 F.3d 309, 313 (4th Cir.2001). Defendants contend, correctly, that plaintiffs are independent contractors and not employees.

■ Whether a worker is an employee or an independent contractor is determined as a matter of law. *Cilecek,* 115 F.3d at 261–63. Courts evaluate the hiring party's right to control the manner and means of employment applying a set of factors, no one of which is determinative. *Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 751, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). These factors are: the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Farlow,* 259 F.3d at 313 (citing *Reid,* 490 U.S. at 751–52, 109 S.Ct. 2166). Summary judgment is not necessarily impermissible even if each status is supported by some factors. *Cilecek,* 115 F.3d at 261–63.

■ The Fourth Circuit has given particular weight to the financial relationship between the hired and hiring parties. *Farlow,* 259 F.3d at 314 (holding that an attorney working for a bank was an independent contractor because she did not receive benefits or a regular paycheck and was treated like a contractor and in spite of the fact that she was required to attend staff meetings and hold bank-specified office hours, and that the bank supplied her with a company car, computer, office, and administrative assistant). The Fourth Circuit held that the failure of an employer to "extend employment benefits or to pay any payroll taxes is 'highly indicative' that the employee is an independent contractor." *Id.* at 315. The Court further noted that the hiring party's "tax and benefit treatment can be 'virtual admissions' of the party's status[,]" and that the "absence of regular, periodic payments is an indicia of independent contractor status." *Id.*

■ Manifestly, it is clear that plaintiffs were independent contractors during their affiliation with CBRB. All of the relevant financial information in the record supports this conclusion. CBRB associates earned income entirely based on commissions generated by their agency relationships with property owners and/or purchasers/lessees. CBRB did not withhold any taxes from its payments to the affiliated associates; did not require them to complete W–2 forms; and offered no associate any of the customary employment benefits such as health insurance, disability insurance, or a 401K. As a matter of law on this record, the intent of the parties clearly was that plaintiffs were affiliated as independent contractors, precisely as the relevant agreement itself was called: an Independent Contractor agreement. This conclusion is not called into question by the fact that plaintiffs were required to work in the office during their assigned "floor duty" times, were required to return phone calls within a specified period, and

were requested or even required to attend office meetings. Those requirements do not evidence employee status. *Id.* Additionally, it is clear and not genuinely disputed that plaintiffs exercised a high level of control over their own schedules. Proa testified that he worked approximately 20 hours on the road, 20 hours in the office, and 10 hours at home. Schiff testified that he worked part-time as an adjunct professor and consultant while affiliated with CBRB, that he took lengthy vacations on a discretionary basis, and that he determined when and how often to attend sales meetings.

As a matter of law, CBRB is entitled to some level of control over its associates to protect its brand. For example, CBRB retained veto power over its associates' advertising materials and client selections to the extent that those selections may implicate CBRB or adversely affect the public perception of the brand. In sum, plaintiffs point to indicia of "control" that are simply necessary incidents to the functioning of an effective sales office and presentation of a uniform service to clients, and mandates imposed by state regulatory requirements. This evidence does not remotely rise to the level of micromanagement indicative of an employer-employee relationship.

This conclusion is fully consonant with judicial precedent involving the status of real estate agents. *See generally MacDougall v. Weichert,* 144 N.J. 380, 435–43, 677 A.2d 162, 189–93 (1996) (Pollock, J., dissenting) (collecting cases). For example, in *Kakides v. King Davis Agency, Inc.,* 283 F.Supp.2d 411 (D.Mass.2003), a real estate agent was required to attend weekly marketing meetings and periodic training seminars and to perform floor duty during office hours to accommodate walk-in business. Additionally, the brokerage provided the worker with an office

and basic office equipment. Like the situation here, the agent did not receive a fixed compensation or fringe benefits, and earned her income entirely through commissions. Her time was generally unstructured and she could bring in her own business, develop her own leads, and market herself as an independent agent. The court determined that the required meetings and floor duty were insufficient to make the agent an employee and granted summary judgment for the defendant. *Id.* at 416–17. *Accord Krijn v. Pogue Simone Real Estate Co.,* 752 F.Supp. 102 (S.D.N.Y. 1990), *aff'd without opinion,* 930 F.2d 910 (2nd Cir.1991); *Stetka v. Hunt Real Estate Corp.,* 859 F.Supp. 661 (W.D.N.Y.1994); *Verdecchia v. Douglas A. Prozan, Inc.,* 274 F.Supp.2d 712, 722–23 (W.D.Pa.2003).

Courts grant real estate agents employee status only when the brokerage exerts a significantly higher level of control than is applicable in the case at bar. For example, one court granted a real estate salesperson employee status when the employee was required to work five days per week at a model home location for 4–7 hours per day. The court also noted that the brokerage paid the worker a $2000 monthly salary for her first six months on the job, the employer hired and paid for assistants for the worker from time to time, and the worker was provided with group health insurance plans. *Davis v. Hartland Homes, Inc.,* 2006 WL 2805255 (D.Neb. Sept.28, 2006). The employer exerted far more control over the worker, and several of the *Reid* factors cut more strongly in favor of employee status than they do here. These factors include the location of the work, the extent of the hired party's discretion over when and how long to work, the method of payment (for the time that Davis was paid a salary), the hired party's role in hiring and paying assistants, and the provision of employee benefits.

Similarly, the employer exerted significant control over the real estate agent in *Golden v. A.P. Orleans, Inc.*, 681 F.Supp. 1100 (E.D.Pa.1988). There, the worker was paid $400 per week (against commissions). The employer controlled many of the agent's daily activities: agents were required to submit weekly activity reports by phone and in writing, hours were set by the company, and agents had to participate in weekly sales meetings and seminars with company managers. *Id.*

In short, allowing for a few fact-bound exceptional cases, "in the real estate industry, brokers operate through one or more licensed agents, who are formally affiliated with the broker.... Real estate agents are not employees of the broker; rather, they are independent contractors." *Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 783 F.Supp. 952, 954 and n. 3 (D.Md.1992), *aff'd* 1993 WL 169046 (4th Cir. May 20, 1993), *cert. denied*, 510 U.S. 964, 114 S.Ct. 440, 126 L.Ed.2d 374 (1993). Accordingly, as a matter of law, the conclusion is inescapable that plaintiffs are independent contractors, and that therefore they are not entitled to bring Title VII claims.

## IV.

### A.

Plaintiffs also seek relief pursuant to 42 U.S.C. § 1981. Section 1981 provides as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

42 U.S.C. § 1981. The Supreme Court has observed:

Among the many statutes that combat racial discrimination, § 1981, originally § 1 of the Civil Rights Act of 1866, 14 Stat. 27, has a specific function: It protects the equal right of "[a]ll persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race. 42 U.S.C. § 1981(a). The statute currently defines "make and enforce contracts" to "includ[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b).

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006)(alterations in original).

The Supreme Court has held that § 1981 applies exclusively to racial discrimination, but that a "race" encompasses "any identifiable class of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." This includes Jewish people. *Cf. Runyon v. McCrary*, 427 U.S.

160, 168, 174–175, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987). I take this to mean that as to Schiff's claims, Schiff would have to show that any discrimination against him was motivated by his ethnicity and not solely by his religious beliefs, status, or practices. *E.g., Farbstein v. Hicksville Public Library,* 323 F.Supp.2d 414, 417 (E.D.N.Y.2004) (dismissing § 1981 claim where plaintiff asserted that a library discriminated against him based on his membership in a class that adheres to the Jewish faith); *Man-of–Jerusalem v. Hill,* 769 F.Supp. 97, 102 (E.D.N.Y.1991) (dismissing § 1981 claim where plaintiff claimed religious discrimination based on employer's denial of paid leave for Jewish holidays). I will presume that Shearer knew or assumed that Schiff was both ethnically and religiously Jewish.

■ In any event, *despite the fact that the only similarly-situated African–American makes substantially identical complaints about Shearer's behavior as do Jordan and Schiff,* each of the latter may sue under § 1981, both as a Caucasian, *see McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), as well as one whose "association with" African–Americans gives rise to potential race discrimination under the circumstances here. *See Murrell v. Ocean Mecca Motel, Inc.,* 262 F.3d 253, 257 (4th Cir.2001); *Fiedler v. Marumsco Christian Sch.,* 631 F.2d 1144, 1149 (4th Cir.1980).

It is apparent that plaintiffs' claims rest, most broadly, on assertions that defendants have, in whole or in part on the basis of racial animus, deprived them of their rights, as independent contractors/real estate sales associates, to the full "performance of" and "the enjoyment of all benefits,

privileges, terms, and conditions of" "the contractual relationship."

■ As mentioned, § 1981 claims are limited to race-based disparate treatment and/or hostile environment claims and claims for retaliatory actions taken against a plaintiff who opposed such policies and practices. *See generally CBOCS West, Inc. v. Humphries,* —— U.S. ——, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008). Although Title VII and § 1981 claims rest on distinct legal theories, ordinarily, courts apply the same analyses, including the now traditional four-pronged-*prima-facie*-case, burden-shifting regime of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to employment-based claims under both theories. *Gairola v. Commonwealth of Va. Dept. of Gen. Servs.,* 753 F.2d 1281, 1285 (4th Cir.1985). Nevertheless, it is not clear to me, notwithstanding the parties' acquiescence in that assumption here, that that approach is necessarily appropriate in respect to independent contractors, at least as to certain kinds of claims under § 1981.

Only a few reported cases have been found where § 1981 claims have been brought by independent contractors, and often when cases are brought, the courts do not fully elaborate the appropriate analytical framework. *Danco, Inc. v. Wal-Mart Stores, Inc.,* 178 F.3d 8, 14 (1st Cir. 1999), *cert. denied,* 528 U.S. 1105, 120 S.Ct. 843, 145 L.Ed.2d 712 (2000), is something of an exception. There, the First Circuit affirmed a $300,000 jury verdict in favor of an independent contractor who sued Wal-Mart for hostile environment discrimination under § 1981. The court described the legal framework for such a claim only in passing:

the plaintiff must show not only a contractual relationship but also two further elements: (1) that the plaintiff was ex-

posed to comments, jokes, or acts of a racial nature by the defendant's employees; and (2) that the conduct had the purpose or effect of interfering with the plaintiff's work performance or created an intimidating, hostile or offensive working environment.

*Id.* at 16.

A careful analysis of an independent contractor's claim appears in *Carey v. FedEx Ground Package System, Inc.,* 321 F.Supp.2d 902 (S.D.Ohio 2004). The court denied FedEx's motion for summary judgment against an African–American independent contractor who sued under § 1981. The contractor expressed his interest in obtaining a delivery route, made a number of preparations, and received repeated assurances from FedEx that he would receive his route shortly but the company held him off for eighteen months, while awarding routes that became available to white applicants. *Id.* at 905–12. The court, in analyzing the summary judgment motion, applies a modified *McDonnell Douglas* burden-shifting test. The court treats the claim as if it was a Title VII claim, and not without some justification, one supposes, since a claim based on *a refusal to enter into a contract* is quite analogous to a claim based on a *failure to hire.*

Of greater assistance here is *Wortham v. American Family Ins. Group,* 385 F.3d 1139, 1141 (8th Cir.2004). There, an African–American female insurance agent appealed an adverse summary judgment concluding as a matter of law that she was an independent contractor. She had brought Title VII claims (which were dismissed because plaintiff was an independent contractor) and § 1981 claims against an insurer with which she had an agency agreement. The Eighth Circuit affirmed the independent contractor ruling and, when analyzing her parallel § 1981 claim, stated that to establish her prima facie case she would have to prove that: (1) she is a member of a racial minority; (2) the company intended to discriminate against her on the basis of race; and (3) the discrimination concerned an area enumerated in section 1981. *Id.* at 1141. The court did not explicitly analyze the § 1981 claim, noting summarily that plaintiff "presented insufficient evidence to support her bare allegation of discrimination." *Id.*

This seems to me, under the circumstances of the case at bar, to suggest an appropriate formulation of a test for a *prima facie* case of an intentional discrimination claim asserted under § 1981. The case at bar involves claims brought by plaintiffs/independent contractors against the agents (here, Shearer and Sinnickson) and the principals (here, the corporate defendants) of the other contracting party. This case *does not* involve claims based on a *refusal to contract, cf. Carey,* but rather, claims that performance of, or the full enjoyment of the benefits arising from performance of, the independent contractor agreement, have been purposefully impeded or undermined on the basis of race. *Cf. Danco, supra; Wortham, supra.* Summary judgment practice requires a molded framework for he evaluation of such claims, and, should such a case survive summary judgment, a jury will need the guidance afforded by an appropriately tailored framework.

▇▇▇ Thus, I conclude that to establish a *prima facie* case here, where there is no (or scant) direct evidence of racial animus, a plaintiff must project evidence sufficient if believed to show that: (1) he or she is a member of a protected class; (2) the character and timing of the defendants' declarations, acts, and omissions, if any, in the context of the respective contractual rights and obligations of the parties, reasonably support an inference of an

intent to discriminate against plaintiff on the basis of race; and (3) the declarations, acts, and omissions shown had a natural tendency to impede or to thwart plaintiffs' performance of, or their enjoyment of the benefits of, the contract. *Cf. id.; McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If a plaintiff establishes a *prima facie* case under this formulation, then the defendant may come forward with evidence, i.e., assumes a burden of production, and must articulate a legitimate, nondiscriminatory explanation for the acts and omissions complained of. *Cf. Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Finally, the plaintiff must ultimately prove by a preponderance of the evidence that the explanations for defendants' acts or omissions are false and/or, even if true, a pretext for discrimination. *Id.; Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)(clarifying "mixed motive" analysis of employment discrimination claims).

This formulation seems usefully to take account of several important aspects of the kind of claims asserted here. First, as applied to facts such as those here, the proposed test acknowledges that where the defendant's agent herself knowingly *entered into* a contract with a person in a protected class, an inference of discrimination in the *performance* by that agent of the contractual undertakings is, at best, counterintuitive. At a minimum, such a plaintiff ought to be put to the burden of marshaling evidence that rises above subjective opinion and gross speculation. *See Proud v. Stone*, 945 F.2d 796, 797, 798 (4th Cir.1991).

Moreover, in the ordinary case, such a plaintiff should not be expected to satisfy element two of a *prima facie* case if she cannot demonstrate through competent evidence that she was treated differently than similarly-situated persons outside of her protected class. *Cf., e.g., Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir.1996) (affirming summary judgment because plaintiff was unable to show that a similarly situated man was treated differently in a discriminatory promotion case); *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993) (affirming summary judgment in disciplinary discrimination case because employee only provided one example of an arguably similarly situated white employee who received less severe discipline for similar misconduct); *Pulley v. KPMG Consulting, Inc.*, 348 F.Supp.2d 388, 395 (D.Md.2004) (granting summary judgment in part because plaintiff could not identify any employees outside his protected class who was similarly situated and did not suffer repercussions for his actions).

■ Finally, element number three acknowledges that where racial animus does infect the contractual relationship, if such an invidious attitude by a defendant likely had no effect on contractual performance or the enjoyment of the benefits thereof, then a *prima facie* case of disparate treatment will not have been shown. *Cf. Settle v. Baltimore County*, 34 F.Supp.2d 969, 991 (D.Md.1999)("Title VII's protections do not insulate one from either the normal day-to-day dissatisfactions and annoyances commonly arising in any workplace or from the sometimes unpleasantness of a surly, strict or even personally insufferable and demanding supervisor."), *aff'd*, 203 F.3d 822 (Table), 2000 WL 51283 (4th Cir. Jan.24, 2000).

B.

■ Application of the proposed test to the record here compels the conclusion that plaintiffs' substantive claims under § 1981 fail. The thousands of pages in the

summary judgment record clearly evidence that Shearer was less than an ideal branch manager. There is no dispute that she showed preferential treatment to the sales associate who was her romantic interest (and is today her husband), screamed at her subordinates, and could arguably have been characterized as abusive. It is also clear that Mary Flanagan, Shearer's successor as branch manager at the Chestertown CBRB office, is a much more pleasant, accommodating, and respectful manager. However, a rude, crude and nasty branch manager who generates an unpleasant or even miserable work environment does not necessarily translate into a § 1981 claim. Additionally, many of the incidents, indeed most of the incidents, cited by plaintiffs are not remotely connected to racial animus.

Most importantly, plaintiffs fail to provide evidence that Shearer treated similarly situated employees who did not share their racial characteristics differently. Instead, they make general and conclusory assertions, based entirely in their own deposition testimony, to argue that Shearer did not attack other associates—"white, Christian, associates," with the same "vengeance" that she displayed toward plaintiffs. Cf. *Mackey v. Shalala*, 360 F.3d 463, 470 (4th Cir.2004). ("An employee's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case."). But even that assertion is undercut by Schiff's testimony. See p. 456, *supra*. Plaintiffs employ much hyperbole, apparently in the belief that offended sensibilities and volume of paper can ground an employment discrimination claim. But despite Shearer's regularly rude, overbearing, and offensive conduct, plaintiffs strain to identify genuine contractual or cognizable dignitary harms she inflicted upon them, or to connect any alleged injury to racial animus, as opposed to simple rudeness and self interest.

Plaintiffs do provide some comparative evidence, but it is the wrong type of comparative evidence. For example, plaintiffs show that Shearer's replacement, Flanagan, would have approached situations differently. But plaintiffs need to show that Shearer treated similarly situated sales associates differently because of race, not whether a different supervisor might have taken a different approach to the management of sales associates. In each case, plaintiff's claim fails because it is not shown that Shearer treated the plaintiff differently because of race, or that her acts or omissions "had a natural tendency to impede or to thwart plaintiffs' performance of, or their enjoyment of the benefits of, the contract."

### 1. Proa

Proa fails to establish the second and third elements of the prima facie case. He wholly neglected to provide any evidence to demonstrate that a similarly situated non-African-American received more favorable treatment. (Of course, as mentioned, his co-plaintiffs' contentions prove, if anything, that the opposite is true.) He also fails to show that he was denied any of the benefits of his contract; to the contrary, he thrived as a "rookie of the year" level associate in his brief 15 month career at the Chestertown office.

Proa lists numerous situations where he claims that Shearer "mistreated" him, but none of them rise to the level of a cognizable claim. For example, Proa claims that Shearer required him to attend sales meetings, but made them optional for others. But then he admits that he did not attend many meetings. (Proa dep. at 253–55.) He says it was discriminatory that he did not receive a mentor, but he concedes that the Chestertown office lacked a mentoring program. (*Id.* at 213–15.)

Proa also offers several transactions as examples of Shearer's "discrimination" against him. His examples include: Pine Street, Millbrook Drive, Church Hill Lane, the Water Street property, and the Oak Hollow Town Homes. None of these examples reasonably support an inference of intentional discrimination; and none is shown to have impeded or thwarted the lawful performance of his contractual obligations.

Proa received his full commission as to the Pine Street transaction. Although he believes that Shearer called his client's loan officer to tell her not to help Proa's client, he conceded that he did not hear what Shearer told the loan officer, and has no factual support for his belief. Shearer asserts that she asked the loan officer to quickly grant the mortgage because the contract would soon expire without it. (Shearer dep. at 152.)

Proa also received a commission from the Millbrook Drive property. He believes that he had to share it with Scott Othoson for discriminatory reasons, (Proa dep. At 185.), but the evidence shows that Proa received the proper seller's commission, whereas Othoson received the proper buyer's commission. And even if Othoson was the beneficiary of some unmet ethical challenge by Shearer in pushing commissions to her boyfriend, there is no requirement that the explanation be discarded for purposes of Proa's *prima facie* case. (Indeed, Proa concedes that Shearer favored Othoson because she was romantically involved with him.) (*Id.* at 186.) Thus, defendants clearly have a rational and non-discriminatory, even if distasteful, unfair, and unethical explanation, for Shearer's actions.

The admissible evidence surrounding the Oak Hollow Town Homes flatly contradicts Proa's speculation as to his failure to get the deal. Proa, relying entirely on unfounded speculation, alleges that Shearer prevented him from becoming the primary agent for the Oak Hollow Town Homes because she refused to attend a specific meeting. (Proa dep. at 193, 325–26.) But the evidence shows that the developer, Barry Feaga, disfavored Proa's candidacy for reasons that had nothing to do with whether Shearer attended a meeting. (Feaga dec. ¶ 3–6.)

As to Water Street and Church Lane, Proa has projected no evidence that he was legally or practically entitled to a particular commission. Proa concedes that Shearer initially gave him the Church Lane Property listing. He asserts, nevertheless, that Shearer unfairly prevented him from representing the sellers of the Church Lane Property. (*Id.* at 197–98.) Shearer contends she took the listing away from Proa because the sellers complained that he was not responding to their calls in a timely manner. (Shearer dec. ¶ 22.) These facts do not rationally support an inference of discriminatory animus for two principal reasons. First, *Shearer actually gave Proa the listing.* Second, Proa offered no evidence that he definitely would have received a commission if Shearer had not acted. Thus, Proa's complaint about this discrete transaction is not supported by evidence sufficient to satisfy the elements of his *prima facie* case under § 1981.

Proa claims that Shearer acted in a discriminatory manner when he was refused part of the commission from the Water Street property. But Proa appears to have violated Maryland law with respect to that representation because he was representing both the buyer and the seller. Under Maryland law, it is a conflict of interest for a real estate agent to represent both a seller and a buyer in a transaction. Md.Code Ann. Bus. Occ. & Prof. § 17–530(c) ("Except as otherwise provided in subsection (d) of this section, a li-

censed real estate broker, licensed associate real estate broker, or licensed real estate salesperson may not act as a dual agent in this State.") The same *brokerage* is permitted to represent both sides of a transaction, but only if the brokerage assigned two different *salespeople* to the transaction and both parties signed a waiver. *Id.* § 17–530(d). The record shows that Proa was the only associate working on the transaction. It is curious in the extreme that Proa urges this transaction as evidence of discrimination.

Whatever Proa might think of such alleged "technicalities," they have serious implications for real estate brokerages when understood in full historical and legal context. *See* Ann Morales Olazabal, *Redefining Realtor Relationships and Responsibilities: The Failure of State Regulatory Responses,* 40 HARV. J. ON LEGIS. 65, 65–68 (2003):

> For much of the twentieth century, residential real estate transactions tended to conform to a specific "traditional" model-the seller engaged a real estate broker, the "listing broker," who listed the home in a multiple listing service, where it was noticed by a "cooperating" or "selling" broker, shown to prospective purchasers, and ultimately purchased by one of them, with a commission paid to the brokers by the seller from the sale proceeds. In this classic setting, the selling broker was a subagent of the seller through the multiple listing contract and an agreement to split the commission. This traditional listing/selling broker model-where the buyer typically went unrepresented in the transaction-was the norm.

> As the form and substance of the industry expanded, and realtors became more central to the real estate transaction, their precise duties and loyalties became less clear. Commentators have

for some time agreed that the traditional listing/selling broker model creates agency relationships that are counterintuitive to the parties and that, all too often, neither consumer nor realtor seems to know exactly what is expected or required within the context of the legal relationship. The agent that works with the buyer is, in fact, often a seller's subagent. This could easily be overlooked by the seller (who could be held vicariously liable for the licensee's conduct), misunderstood by the buyer (who may believe that the agent working with her actually represents her), and sometimes even confused by the subagent or licensee (who may also erroneously see her role as "representing" the buyer).

> Contributing to the confusion, there is very little standardization in licensing laws and agency rules regulating realtors. Moreover, judicial decisions regarding realtor liability are far from uniform; the case law in this area was and continues to be in a state of disarray in many jurisdictions.

> These problems have not gone unnoticed. Beginning more than a decade ago, state legislators enacted a variety of new initiatives to address many of the ills created by the traditional model. Most focused on requiring disclosure of the realtor's agency relationship to the consumer; others went much further, redefining the role of the real estate licensee, thereby ostensibly benefitting both licensees and consumers. Beginning in the mid–1990s, many state legislatures and administrative agencies began to limit realtor liability by creating statutory safe harbors and by explicitly defining realtors' duties to both clients and non-clients. Forms of representation beyond the traditional model began to surface and gain legal recognition. Among them is the "buyer's broker,"

who is engaged and paid by the buyer, and whose fiduciary duties run exclusively to the buyer. Most recently, a number of states have passed laws that clear the way for real estate brokers to act in a "non-agent" capacity, essentially as agents of the transaction rather than of either of the parties, owing reduced fiduciary obligations, if any.

Very little has been written about these new forms of realtor "representation," or "non-representation," in part due to their novelty and the resulting dearth of court analysis. Nonetheless, a growing number of real estate licensees can now operate as statutorily limited real estate agents, sheltered from the decade-old explosion of realtor liability lawsuits.

Finally, Proa argues that he was "fired." This contention is erroneous as a matter of fact and law. The facts clearly show that Proa accepted a reassignment from the Chestertown office to the Easton office, an office less than 40 miles away, at his own request. Proa began working in Easton less than one week after his January 2004 meeting with Sinnickson and Shearer. He concedes that he suggested the transfer. (And Proa had a very good year in 2004.) No "deprivation" is demonstrated on this record.

## 2. Jordan

Like Proa, Jordan cannot demonstrate that any racial animus was directed at her and she cannot demonstrate that any similarly situated sales associate outside of whatever protected class she claims for herself received more favorable treatment. Her disparate treatment claim fails.

■ Jordan purports to have direct evidence of Shearer's racist acts, but her examples are limited to "stray remarks" unrelated to any actual contract-based decision. Derogatory remarks may consti-
tute direct evidence only if the remarks were related to the employment decision in question and were not stray or isolated. *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 608 (4th Cir.1999), *abrogated on other grounds by Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). Here, Jordan offers a handful of remarks from Shearer, each of them certainly repugnant to people of good will, but most of which do not relate to race, and none of which relate to or have any demonstrable adverse effect on Jordan's enjoyment of the benefits of her independent contractor status.

Jordan also fails to generate a genuine issue of material fact regarding any adverse effect on her performance of, or enjoyment of the benefits of, her short-lived independent contractor agreement by Shearer's acts and omissions. Although Jordan also asserts, as did Proa, that she was "fired," her own account of the situation clearly shows that she terminated her affiliation because she grew weary of Shearer's alleged interference. On March 10, 2004, after Shearer reprimanded her, Jordan voluntarily collected her things and left the office. (Jordan dep. at 272.) She recounted telling Shearer: "You give me no choice. I'm going to have to try to go to Easton, like Sean[,]" and that she knew that March 10, 2004, was the end of her affiliation with CBRB in Chestertown. (*Id.*) Jordan may feel that Shearer "fired" her, but her subjective feeling does not alter the undisputed fact that she terminated the affiliation.

Furthermore, there is not a scintilla of evidence to suggest that defendants' decision not to accept Jordan's request to restore her affiliation with CBRB is tainted by racial considerations. Instead, defendants were equally likely motivated by Jordan's poor judgment, exemplified in one situation where she insisted on represent-

ing a seller who fully disrobed and started touching himself in front of her while she was visiting his home. (Jordan dep. at 186–92.)

■ In an acknowledgment that Jordan terminated her affiliation and that she was not "fired," she also purports to allege a § 1981 "constructive discharge" claim. What has been said already fully disposes of this claim. In this case, the critical elements of a constructive discharge claim are "(1) deliberateness of the employer's action; and (2) intolerability of the working conditions." *Munday v. Waste Mgmt. of N. Am.,* 126 F.3d 239, 244 (4th Cir. 1997). The Fourth Circuit construes such claims particularly narrowly and has repeatedly asserted that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Williams v. Giant Food, Inc.,* 370 F.3d 423, 434 (4th Cir.2004) (citing *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994)).

■ Without even considering the "deliberateness" of the race-based declarations and alleged acts here, it is abundantly clear that Jordan cannot show intolerability. The standard for intolerability is "whether a reasonable person in the employee's position would have felt compelled to resign-that is, whether [s]he would have had no choice but to resign." *Blistein v. St. John's College,* 74 F.3d 1459, 1468 (4th Cir. 1996) (quoting *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985)). In all of her evidence, Jordan shows, at best, that Shearer yelled at her several times, made isolated derogatory comments about minority groups, and perhaps refused to help Jordan win certain clients of whom Shearer disapproved for racially-neutral reasons. Although unpleasant, these facts do not sum to an objectively intolerable workplace. *See infra* pp. 470–71 (rejecting hostile environment claims). *Cf. Williams v. Giant Food Inc.,* 370 F.3d 423, 434 (4th Cir. 2004) (holding that the employee's allegations that supervisors yelled at her, told her she was a poor manager, gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back did not establish objectively intolerable working conditions as required to support a claim of constructive discharge). Indeed, *the very fact that Jordan sought to re-affiliate with the Shearer-led Chestertown office demonstrates that she did not regard the conditions there as "intolerable."* Accordingly, any "constructive discharge" claim fails.

### 3. Schiff

Schiff's disparate treatment § 1981 claim fails because he does not provide any comparative evidence that non-Jewish sales associates received more favorable treatment. In fact, Schiff's testimony tends to prove the opposite: he testified that Shearer treated all types of people badly, including people who were white and Christian. (Schiff dep. at 135.) More specifically, Schiff testified that Shearer "stole" listings from *all* of the associates in the office and he attributed Shearer's actions to greed, and not to racism. (*Id.* at 255–56, 394–98.) Certainly, the experiences of Schiff's co-plaintiffs, one white, one black, support his assessment.

Schiff also argues that Shearer removed his name as the associate or otherwise thwarted his efforts to sell certain properties. These include the following properties: South Water Street, David Street, the Oak Hollow property, a property all parties call "the Women in Need" property, the Massey property, and an unnamed property.

For the unnamed property, Schiff alleged that Shearer stopped helping him negotiate the financing for a specific property when she learned that the prospective purchasers were black. (*Id.* at 357–64.) But Schiff fails to provide any facts to support this claim, but even if he did, this claim does not support Schiff's assertion that Shearer discriminated against him based on his Jewish ethnicity.

Schiff alleges that Shearer did not sufficiently support him in a controversy with another associate about how should receive the commission on the sale of the Massey property. (*Id.* at 385–87.) But without additional information, it is impossible to know if this qualifies as an impairment of Schiff's independent contractor agreement.

Shearer's actions regarding the South Water Street and David Street property do not support an inference of discrimination because Schiff ultimately received the full standard commission for his work. (Schiff dep. at 301–02, 325–26.)

Similarly, the circumstances surrounding the Oak Hollow Property do not support an inference of discrimination because Schiff received a commission as the seller's agent (despite the fact that he was not even listed as the seller's agent). (*Id.* at 342–49.)

Shearer's actions, or lack of action, regarding the Women in Need property likewise do not point to discrimination as a potential motivation. Indeed, Schiff concedes that he did not assist at all in negotiating the lease of the property. In fact, Schiff did not even know who negotiated the deal. (*Id.* at 314–15.) Additionally, Schiff never spoke to the property owner about obtaining a commission. (*Id.* at 308.)

Schiff's most plausible claim is that Shearer intentionally and discriminatorily reduced his "duty shifts" in retaliation for his refusal to work on Saturdays, his Sabbath. He alleges that Shearer cut his shifts from 8 to 10 per month to 1 to 2 per month, and that the decrease was tantamount to giving him an "80% pay reduction." Here, as with some of Schiff's other complaints, there is a real question whether the complaint is one of race discrimination, and thus covered by § 1981, or a form of religious discrimination/failure to accommodate, redressable under Title VII but not under § 1981.

I need not resolve this issue, however, because the actual scheduling calendars in the record flatly contradict Schiff's recollection of the drop-off in his shift assignments. (Paper 135, Ex. 2.) During the period immediately before Schiff's decision not to work on Saturdays, he was scheduled for three to six shifts per month. After mid–2005 when Schiff began refusing Saturday work, he was assigned two to four shifts per month. In substance, his shift assignment was reduced by one or two shifts per month, which is unremarkable in view of his assertion that he had previously worked at least one Saturday per month.

\* \* \*

For the reasons explained above, the court applies its test for a *prima facie* case derived from familiar legal principles and concludes that no plaintiff has generated evidence sufficient to establish a *prima facie* case of disparate treatment under § 1981. Moreover, to the extent that any plaintiff has met that burden, and none has, defendants have proffered unrebutted nondiscriminatory explanations for each and every alleged race-based "infringement" on any plaintiff's ability to perform, or enjoy the benefits of his or her performance of, the relevant independent contractor agreement. Accordingly, defendants are entitled to judgment as a matter of law

as to the disparate treatment claims under § 1981.

## C.

■ As previously discussed, the First Circuit recognized a hostile environment claim under § 1981 in *Danco, Inc. v. Wal–Mart Stores, Inc.*, 178 F.3d 8, 14 (1 st Cir.1999), *cert. denied*, 528 U.S. 1105, 120 S.Ct. 843, 145 L.Ed.2d 712 (2000). The court noted that

the plaintiff must show not only a contractual relationship but also two further elements: (1) that the plaintiff was exposed to comments, jokes, or acts of a racial nature by the defendant's employees; and (2) that the conduct had the purpose or effect of interfering with the plaintiff's work performance or created an intimidating, hostile or offensive working environment.

*Id.* I must add to this articulation of the elements the requirements, insisted upon by the Fourth Circuit in every other context, that "the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere" and that "there is some basis for imposing liability on the employer." *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir.2006). The Fourth Circuit has acknowledged that, even in the employer/employee context, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir.2008). "Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than rude treatment . . ., callous behavior by superiors, or a routine difference of opinion and personality conflict with [one's] supervisor are not actionable." *Id.* (internal citations omitted).

■ Here, as a matter of law, plaintiffs cannot sustain a hostile work environment claim because they cannot adduce evidence

sufficient to meet the "severe or pervasive" requirement. The ravings of a single manager, particularly involving such wide-ranging and generalized outbursts as are shown on this record, do not supply the degree of hostility required for a hostile work environment claim. Under Fourth Circuit law, complaints premised on "callous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir.2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir.2000), are not actionable. Instead the environment must be pervaded with discriminatory conduct "aimed to humiliate, ridicule, or intimidate," thereby creating an abusive atmosphere. *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir.2007) (en banc). Plaintiffs boldly invoke the "humiliate, ridicule, or intimidate" standard, but they have fallen far short in marshaling evidence to support its invocation.

In *Danco*, the court affirmed a jury award under unusual circumstances, but circumstances that undoubtedly would be viewed by any person of good will to have the intent and effect of humiliating, ridiculing, and intimidating. The harassment claim involved evidence of three discrete incidents, among them evidence of explicit racial declarations, including graffiti prominently declaring, "White Supremacy" inscribed and left uncovered over several weeks in the work environment. There was also an accompanying minor physical assault on the sole shareholder of the hired corporate party. Defendant had failed to seek dismissal of the claim as to the sole shareholder, who alone suffered non-pecuniary (or any) damages from the harassment.

In affirming the judgment, the First Circuit specifically declined to apply "plain

error" review to correct defendant's failure to challenge the submission of a defective claim to the jury. Even in affirming the judgment, the court noted:

> In this case, all of the incidents involved utterances but one also involved a low level of physical violence (or so the jury could have found) and one, it could be argued, effectively lasted for months because Guiliani had to face the graffiti on the parking lot every time he worked on the lot. Guiliani also alleged that he altered his schedule so that he would work on the Wal–Mart lot in daylight because of the harassment, an action that suggests some amount of interference with his work because of the harassment. Although much of the evidence was contested, the jury is assumed to have believed the plaintiffs' version....
>
> *Even on this premise, these allegations do seem rather tame compared to many reported cases involving racially hostile working environments*.... However, they are not so trivial that we would countermand a jury's decision that they constituted a violation of section 1981.

178 F.3d at 16–17. (Citations omitted; emphasis added).

In the case at bar, in contrast to *Danco*, plaintiffs have not provided evidence of facts sufficient to bring their claims close to the applicable standard. Shearer may have made several comments that were in poor taste and plainly offensive to all persons of good will, but she never used explicit epithets, invective, vituperation, or similar threatening speech. Even if Shearer were the "unreconstructed bigot," *see Demby v. Preston Trucking Co., Inc.*, 961 F.Supp. 873, 881 (D.Md.1997), the plaintiffs paint her to be, which she vehemently denies, her declarations and acts shown in this record do not satisfy the relevant legal standards. In short, as a matter of law under the circumstances here, no reasonable jury could conclude that she created a *pervasive* environment of unrelenting hostility on the basis of *race*.

Schiff points to numerous alleged anti-Semitic comments from Shearer as well as the fact that Shearer did not let him post his activities in the Jewish community on his website page. Although despicable and insensitive if true (as they are assumed to be here), these acts and declarations do not rise to the level of "pervasive or severe" as required by circuit precedent.

In sum, as plaintiffs suffered something less than severe or pervasive race-based harassment, annoyances not approaching the "tame" but actionable circumstances accepted as sufficient by the First Circuit, *see Danco, supra*, their hostile environment claims fail.

## D.

■ Section 1981 affords relief for retaliation. *CBOCS West, Inc. v. Humphries*, —— U.S. ——, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008). To establish a *prima facie* case of retaliation under § 1981, a plaintiff must show (1) that he engaged in a protected activity; (2) that defendant took adverse action against him; and (3) the protected activity was causally connected to the adverse action. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir.2007); *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir.1997). To prove a causal connection, a plaintiff must be able to show that defendants' actions were "because the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998).

■ In the context of the § 1981 claim asserted here, "protected activity" would

include acts and statements in opposition to policies or practices that discriminated against any person on the basis of race. *See Humphries*, 128 S.Ct. at 1954, 1961 (affirming lower court's judgment that former assistant manager of restaurant may bring a § 1981 retaliation claim for adverse action taken against him for complaining about the race-based termination of another employee). If this showing is made, the burden of production (but never proof) shifts to the defendants to articulate a legitimate, non-retaliatory explanation for their actions. *Holland*, 487 F.3d at 218. Then, the burden shifts back to the plaintiff to demonstrate that the defendants' proffered explanations are mere pretext for retaliation. *Id.*

▆ Plaintiffs cannot establish any of the elements of a *prima facie* case. Proa and Jordan both rely exclusively on their own deposition testimony to make dubious assertions that they engaged in protected activity by complaining to Sinnickson about Shearer. The argument is nonsensical for Jordan, considering that she terminated her affiliation with CBRB before she contacted Sinnickson. It also falls flat for Proa because he concedes that he did not make any complaints about *race discrimination* or *racial harassment* until after he left the Chestertown office. (Proa dep. at 349–50.) Nor does Proa allege any claim of retaliation after leaving Chestertown.

For his part, Schiff alleges, as discussed above, that Shearer reduced his revenue-generating shift assignments to penalize him for his decision not to work Saturdays, the Jewish Sabbath. It is not clear that Schiff's act of listing himself as unavailable for work on Saturdays is a "protected activity" under § 1981, but assuming that requirement is met (and assuming further that such ostensible retaliation is based on something other than religious liberty), Schiff still must demonstrate that he was

subject to an adverse action in respect to his right to enjoy the benefits of his contractual entitlements. As discussed above, Schiff substantially overstates the reduction in his shift assignments. In reality, his shift assignments did not change except that he was no longer assigned the Saturday shift, and thereby lost those particular days, but essentially, only those days. He got what he wanted.

### V.

▆ Independent contractors are entitled to toil in an American workplace that is not infected with the poison of racial animus, every bit as much as employees are so entitled. Nevertheless, the legal standards imposed on claimants seeking relief from those in charge of, or responsible for, what occurs in the workplace have real content. There is no unfairness in requiring of such claimants that those standards be satisfied; here they are not. Accordingly, for the reasons stated herein, defendants' motion for summary judgment shall be granted as to all defendants on all federal law claims. In the absence of complete diversity of citizenship, the court elects not to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c). Accordingly, all remaining state law claims shall be dismissed without prejudice for lack of jurisdiction. An Order follows.